EDMUND WILSON, attorney-general,

*v.*

EAST JERSEY WATER COMPANY.

[Decided February 17th, 1911.]

1. A corporation incorporated under the General Corporation act (*Rev. 1877 p. 179 § 10*) has, as a riparian owner, the right to use the water of the stream so far as is reasonably necessary, subject to the obligation to leave the stream otherwise undiminished in quantity and unimpaired in quality, and it may not as riparian owner take water from the stream for the use of municipalities.

2. The state as the trustee for the public has a residuum of common and public ownership in the running streams within the state, subject to the rights of private riparian owners, and may forbid all unlawful diversion of water by riparian proprietors.

3. The state may, by its attorney-general, restrain unlawful diversion of water of streams of the state by riparian proprietors, though it cannot point to any tangible injury resulting therefrom.

4. The right of eminent domain given by the state does not include the power to condemn the property of the state, but the state's rights can only be acquired by grant from the state.

5. A grant by the state of its rights may be express or by necessary implication.

6. A grant by the state to a municipality of the right to construct an ordinary sewer system, by implication authorizes it to discharge sewage into the stream, and thereby interfere with the state's rights to have the waters flowing unimpaired in quality.

7. A charter of a corporation empowering it to use the waters of any springs near its works, and to dispose, use, hire or rent water which it may purchase, or procure, from the owner or owners of the soil, does not expressly grant without compensation the state's rights in the waters of a stream of the state, but the power read literally is only to acquire the title of the owner of the soil in the water.

8. The court will not determine the rights of municipalities under legislative acts to appropriate the waters of streams of the state for municipal purposes, where the municipalities are not parties.

9. A corporation formed under the General Corporation act (*Rev. 1877 p. 179 § 10*), as amended by *P. L. 1888 p. 112*, may make contracts with municipalities authorized by act April 2d, 1888 (*Gen. Stat. 1895 p. 2210*), authorizing municipalities to enter into a contract with any "water company, or other company, contractor or contractors" for a water-supply.

10. A corporation formed under the General Corporation act (*Rev. 1877 p. 179 § 10*), which enters into a contract with a municipality, as authorized by act April 2d, 1888 (*Gen. Stat. 1895 p. 2210*), to supply the municipality with water, does not thereby obtain any additional franchise or power, and all that the corporation may do is to exercise the rights of the municipality to divert waters of a stream for the use of the municipality, which alone appropriates the water.

11. A contract between a municipality having the right to divert the water of a stream of the state for municipal purposes and a corporation organized under the General Corporation act which binds the corporation to deliver, and the municipality to accept, a supply of water needed by the municipality or its inhabitants for private or public use, and which binds the municipality to pay a specified sum for all water delivered, is within *Gen. Stat. 1895 p. 2210* authorizing municipalities to contract with corporations for a water-supply, for the corporation merely agrees to filter the water, and then conduct it from the stream to the municipality for the consideration agreed on.

12. The court will not determine the validity of contracts between municipalities and individuals and corporations for water-supply from the streams of the state, unless all the parties interested in the contracts are made parties.

13. Where municipalities have the right to divert the waters of the streams of the state for municipal purposes, the state is not barred by laches from restraining diversion of water of a stream merely because it stood by for many years and allowed a corporation without objection to acquire riparian lands, establish a filter plant and reservoirs, and lay pipes to supply water to municipalities and to divert the water for the municipalities under contracts to supply them with water; the state not having notice of the contents of unrecorded contracts between the municipalities and the corporation.

14. Nor will such laches raise an estoppel against the state to sue to restrain the diversion of the water of the streams.

On information.

*Mr. Edmund Wilson,* attorney-general, *pro se.*

*Mr. William H. Corbin* and *Mr. Charles L. Corbin,* for the defendant.

STEVENS, V. C.

This is an information filed by the attorney-general praying for an injunction against the East Jersey Water Company restraining it from diverting any water from the Passaic river at Little Falls.

The information states that the company was incorporated under the General Corporation act in August, 1889, for the purpose, among other things, of storing, selling and delivering water and of constructing and maintaining the necessary reservoirs, pipe lines and other works therefor; that it has established extensive works at Little Falls, on the Passaic river, and has there constructed a large filter plant and pumping station, and daily diverts from the Passaic river several millions of gallons of water in order to supply the inhabitants of Bayonne, Harrison, East Newark, Kearney, Nutley and Little Falls with water for domestic and public use; and that it is doing this without any warrant of law.

The answer of the company admits its incorporation under the General Corporation act and the establishment of its works at Little Falls. It denies that it is diverting water without authority of law and avers that the municipalities mentioned in the information have lawful authority, under chapter 250 of the laws of 1888, and by the legislative acts under which they are created, and under the general laws of the state, to enter into contracts with any water company or other company, or contractor, to obtain a supply of water for the purpose of extinguishing fires and for such other lawful purposes as may be deemed necessary and convenient. The answer then sets up the various contracts entered into with the municipalities named and avers that in order to satisfy those contracts it became necessary for the East Jersey Water Company to acquire the Little Falls water power and land at Little Falls on both sides of the river and in the bed of the stream; to construct appliances thereon, including a filter plant; to purchase rights of way for its pipe lines; to build a reservoir and to install water gates and meters; that it did all this at great cost and with full knowledge of the public authorities; that it has been pumping water for many years, and that the state and public authorities have, with full knowledge, acquiesced therein and are now estopped by acquiescence and barred by delay.

The municipalities supplied are not parties to the bill, and the effect of granting the injunction would be to cut off their water-supply without giving them an opportunity to be heard.

The issue between the company and the state has been very much narrowed by recent decisions made in the case of *Hudson County Water Co.* v. *McCarter*, *70 N. J. Eq.* (*4 Robb.*) *525, 711; 209 U. S. 355,* and of *Paterson* v. *East Jersey Water Co., 74 N. J. Eq.* (*4 Buch.*) *49;* affirmed, *77 N. J. Eq.* (*7 Buch.*) *588.*

In the *Hudson County Case* it was declared by the supreme court of the United States that the state has the constitutional power to insist that its natural advantages shall remain unimpaired by its citizens, and that it is not dependent upon any reason for its will so to do. Mr. Justice Holmes says: "It appears to us that few public interests are more obvious, undisputable and independent of particular theory than the interest of the public of a state to maintain the rivers that are wholly within it, substantially undiminished, except by such drafts upon them as the guardian of the public welfare may permit, for the purpose of turning them to a more perfect use." In that case, in the exercise of its police power, the legislature had passed an act making it unlawful to transport into any other state, by pipes or conduits, the waters of brooks, streams or ponds, and the act was held to be valid. There is no statute restraining the transportation or distribution of water within the state, except the act of 1907 (*P. L. 1907 p. 633*), section 2 of which, however, provides that nothing therein contained shall be construed to take from any municipality the right to use and take all the water which it has the right to use or appropriate by purchase or condemnation.

The attorney-general does not contend that the state has, by express legislation, forbidden the East Jersey Water Company to supply municipalities with water. He rests his case upon the company's lack of power, his position being that having been incorporated under the General Corporation act it is not by that act authorized to engage in the business of selling water.

It is not pretended that the company has, under its charter, any more right to take water than any other riparian owner has. What that right is, is thus stated by Mr. Justice Pitney in the *Hudson County Water Company's Case.* He says: "In a sense the landowner owns the water while it is upon the land, but his

ownership is limited to a usufructuary interest, without right to divert any from its natural course saving for the limited uses that naturally and of necessity pertain to a riparian owner, such as the supply of his domestic needs, the watering of his cattle, the irrigation of his fields, the supplying of power to his mill, and the like. This right of user is limited to so much as shall be reasonably necessary and is qualified by the obligation to leave the stream otherwise undiminished in quantity and unimpaired in quality. The common law recognizes no right in the riparian owner as such to divert water from the stream in order to make merchandise of it, nor any right to transport any portion of the water from a stream to a distance for the use of others."

The East Jersey company is a riparian owner of lands at Little Falls. As such it has the rights above mentioned, and no more. If it has the right to take water from streams for the use of municipalities, such right exists independently of, and outside of, the powers conferred by its charter.

As has already been said, the supreme court of the United States rests its decision in the above-cited case upon the state's right to exercise its police power. But the court of errors and appeals puts its decision of the same case upon other grounds. I shall state what these grounds are in the language of Vice-Chancellor Emery, in the case of *Paterson* v. *East Jersey Water Co., supra.* He says: "The permanent diversion of water for sale was, as I understand (the opinion in the *Hudson Water Company's Case*), held to be an unlawful and unreasonable use of the waters by a riparian owner, and the validity of the act (prohibiting the transportation of water out of the state) was sustained upon the ground, first, that the state, as the trustee for the public, had a residuum of common and public ownership in the running stream subject to the exercise of all rights of private riparian owners; which rights, however, include only lawful uses in connection with the riparian land itself and *exclude diversion for sale,* and that this public ownership of the residuum of interest, entitled the state, in the common interest, to forbid by statute the transportation out of the state of water drawn from its fresh water streams. The second ground upon which the act was sustained was placed upon the right of the

state, as itself a riparian owner, by reason of ownership of the bed of the stream below the tidal flow." This statement is authoritative, for it was approved by the court of errors and appeals on appeal.

Such being the state's right it seems very plain that the state may, by its attorney-general, restrain all unlawful diversions of water by riparian proprietors. If the East Jersey company had no other title to divert such waters than its riparian proprietorship, it would be the duty of this court to enjoin it, for it would be, without right, diverting water to which the state has a double title—its title to the residuum of ownership in the flow of streams and its title as lowest riparian owner. The mere fact that the state can point to no tangible injury is, as was expressly decided in the *Paterson Case,* of no consequence. Whether the company is taking more or less, it is taking property of the state which does not belong to it.

If then it can justify its taking, it must, as I have said, do so, not because of any right conferred by its certificate of incorporation under the General Corporation act, but because of some statutory right outside of its charter, conferred either upon it or upon those with whom it has contracted. It has been able to point to no such right conferred upon itself, and, consequently, it must rest its power to divert upon a right conferred on others. Two questions arise—*first,* have the municipalities named in the information the right, as against the state, to obtain a water-supply; *second,* if they have, does the East Jersey company stand in the position of acting as their lawful agent in obtaining it?

In the discussion of the question, it is to be borne in mind that the possession or non-possession of the power of eminent domain by the contractor or the municipality is not here a matter of much consequence. This power is given, not to enable the company or the individual to condemn the land of the state, but the land of individual proprietors. Vested with this power, conferred in the ordinary way, the conferee has no right to condemn the property of the state. The state's rights can only be obtained by grant from the state itself. Such grant may be express or by necessary implication. Thus, if a railroad, telegraph or tele-

phone company be authorized to construct its line between New York and Philadelphia, it may cross roads or navigable streams in so doing. Says Chancellor McGill, in *Township of Raritan* v. *Port Reading Railroad, 49 N. J. Eq. (4 Dick.) 12:* "That it (a railroad) may cross a highway cannot be questioned. That right is given by implication from the bare authority to build a railroad connecting distant points between which there exist highways that must be crossed." Chief-Justice Beasley expressed the same idea in *State* v. *Hancock, 35 N. J. Law (6 Vr.) 537,* when he said: "A power which is obviously appropriate and convenient to carry into effect the franchise granted has always been deemed a necessary one." This was said in a case where it was held that the state had surrendered its right to tax, a surrender quite as important as a surrender *pro tanto* of the state's right to the flow of a stream. And Chancellor Zabriskie, in *Pennsylvania Railroad Co.* v. *Long Branch Railroad Co., 23 N. J. Eq. (8 C. E. Gr.) 159,* said: "The universal understanding in the state for near a century has been that a statute that gives authority to bridge a navigable river gives authority to appropriate the lands under water belonging to the state without compensation. There are many railroad bridges thus authorized and many more turnpikes and county bridges."

Another illustration of a grant by implication is found in the right of a municipality to discharge its sewage. The state's right is to have the waters flowing over its riparian lands not only undiminished in quantity but also unimpaired in quality. But when the legislature authorizes the municipality to construct the ordinary sewer system it, by necessary implication, authorizes it to put the sewers thus constructed to their ordinary use. The right of the city of Paterson "to vent its sewage into the stream," was the basis of the opinion of the court of errors and appeals in *Doremus* v. *Paterson, 65 N. J. Eq. (20 Dick.) 711.* One will look in vain for any *express* authority on the part of Paterson to discharge its sewage into the Passaic, much less to pollute its waters.

I have not been able to find either in the charters of water companies or in the general laws any direct grant of the state's right in the flow of its streams. In the charter of the Jersey

City and Harsimus Aqueduct Company granted in 1839, the company is empowered "to use the waters of any springs near their said contemplated works." In the act to incorporate the Orange Water Company, passed in 1833, the only provision is that the incorporators, for the purpose of supplying the village of Orange with pure and wholesome water, shall be capable "of disposing and using and hiring or renting the water which they may purchase or procure from the owner or owners of the soil," &c. In neither of these cases, which are typical, is there any express grant, without compensation, of the state's rights in the waters to be taken. In the latter of the two, the power, read literally, is only to acquire the title of the owner of the soil in the water.

The general act authorizing the formation of companies to supply municipalities having a population of not more than fifteen thousand gives power "to take and divert any and all such streams of water as shall be necessary," &c. *Gen. Stat. p. 2199.* The act to enable towns to construct water works authorizes the commissioners "to take and use such parts of the waters of any stream" as the governing board may deem expedient. *Gen. Stat. p. 3559.* The Borough act of 1897 (*P. L. 1897 p. 317*) contains a similar power. In these three cases provision is made for giving effect to this power, as against the owners of lands, by conferring the right to purchase or condemn. Nothing is said about the rights of the state in the water.

Bayonne and Harrison are organized under special charters. *P. L. 1869 pp. 371, 683.* East Newark, Nutley and Kearney under the Borough or Town acts. Little Falls is a township organized, I suppose, under the Township act. Bayonne has the right to contract for a water-supply under its charter and other acts. *Brady* v. *Bayonne,* 57 *N. J. Law* (*28 Vr.*) *379.* East Newark, Nutley and Kearney have the right to acquire a water-supply by the general acts above referred to. I have not been referred to any authority possessed by Harrison and Little Falls to acquire a supply for themselves. They have the right to contract for a supply with companies or municipalities having the right to furnish them with water. *Jersey City* v. *Harrison,* 72 *N. J. Law* (*43 Vr.*) *186.*

The act of April 2d, 1888 (*Gen. Stat. p. 2210*), provides as follows:

"It shall be lawful for the board of aldermen, common council, board of public works, water commissioners, township committee, town committee or other board, body or department of any municipal corporation in this state having the charge or control of the water supply of any such municipal corporation, to make and enter into a contract or agreement with any water company or other company, contractor or contractors for one year or for a term of years, for the obtaining or furnishing of a supply or a further or other supply of water to such municipal corporation and for such other lawful uses and purposes as may be deemed necessary or convenient; and any such contract and agreement, when so made, shall be valid and lawful contract of such corporation as well as of such water company or other company, contractor or contractors according to the tenor thereof."

Then follow other provisions, only two of which are now material, viz., the provision that no contract shall be made for a longer period than twenty-five years in any one term and the provisions that the contract may contain

"an option for the acquiring by such municipal corporation of the land. water and water rights for such supply on terms to be fixed in said contract."

The question arising under these various acts is whether the state has, by necessary implication, in view of the cases to which I have above referred, given its consent to the appropriation by the municipality, in the prescribed mode of its right in such amount of water as may be needed. But, as I have said, the municipalities affected are not parties. The court has not had the benefit of their views. In a question of such vital importance to them they should be heard before the effect of the legislation mentioned or other legislation, if there be any, is finally determined.

Assuming that the municipalities have, as against the state, the right to take the water, the next inquiry is whether the East Jersey company may pump and transmit it. Unfortunately the question does not take this simple form. The company is not, except in the case of Nutley, under contract with the municipalities themselves to transmit it to them. Its contract is with

other companies. The act of 1888 authorizes the proper municipal authority—not anyone else—to enter into a contract "with any water company *or other company, contractor or contractors.*" This act has been the subject of repeated adjudications, and contracts made under it have been directly or indirectly sustained. *Slingerland* v. *Newark, 54 N. J. Law (25 Vr.) 62; Hepburn* v. *Jersey City* (a case arising under the Flynn contract), *67 N. J. Law (38 Vr.) 114, 686; Livermore* v. *City of Millville, 71 N. J. Law (42 Vr.) 503; Jersey City* v. *Kearney, 72 N. J. Law (43 Vr.) 109.*

Except in the case of Little Falls, the municipalities concerned in the present discussion have all contracted under the act of 1888, but not always with the East Jersey company, and so it is important to consider what, under the act, the contractor may do, and what the city may do. The contractor may, without statutory authority, buy riparian or other land and water power. He may erect pumping stations and filter plants and reservoirs. He may, by contract, secure rights of way and lay pipes therein. But he may not condemn land and he may not take any water, unless he is a riparian owner of land, and if he is such owner, he may not, as has been shown, take more than may be needed for the lawful uses of such land. The municipality, on the other hand, may, after having made a contract in pursuance of the act of 1888, lend its power of condemnation. It was so held in *Slingerland* v. *Newark, supra.*

The General Corporation act, as amended by the supplement of 1888 (*P. L. 1888 p. 112*), does not authorize the formation of water companies. On the contrary, it, by implication, forbids it when it declares that nothing therein contained shall be construed to authorize the formation of any company "which shall need to possess the right of taking and condemning land." It does authorize (*inter alia*) companies for "the constructing, maintaining and operating works for the special purpose of supplying water for extinguishing fires in mills, factories and other buildings," and "for any lawful business purpose whatever." I do not see why, under this act, a company might not be formed for the purpose of collecting and selling, for example, mineral waters, subject, of course, to the limitations laid down in *Meeker*

v. *East Orange, 76 N. J. Law (47 Vr.) 435*, and I do not see why a company might not be formed for the purpose of making and executing such contracts with municipalities as are authorized by the act of April 2d, 1888. It is plain that the legislature by using the words "water company or *other* company, contractor or contractors" had in view companies not themselves owners or purveyors of water, but which, nevertheless, were capable of providing the necessary works; in other words, companies so common in these days, organized for the purpose of carrying on the business of contractors and builders.

The charter of the East Jersey Water Company, incorporated under this act, states that the objects for which the company is formed are

"the storage, sale and delivery of water and the construction and maintenance of the necessary reservoirs, pipe lines and other works therefor and the acquisition of the necessary and appropriate property, real and personal, with the power to lease, sell, mortgage and convey the same or any part thereof."

Taken in an unlimited sense, the object thus stated is too broad, but reading it in the light of the Corporation act and restricting it to the limits therein prescribed, we find a company possessed of power appropriate to enable it to enter into a contract with a municipality under the act of April 2d, 1888.

The attorney-general does not attack the corporate existence of the company, but argues: "It is not apparent how the act of April 2d, 1888, by terms or intendment, increased the corporate powers of the defendant company. If the diversion of water at Little Falls was an *ultra vires* act upon the part of the defendant before the adoption of this act, it was none the less *ultra vires* after the act became operative. According to our contention it cannot be construed to have conferred upon the defendant company the right to do an act which was until then by law forbidden."

It is undoubtedly true that the act did not confer any additional franchise upon the contractor. It did not, for example, vest him with the power of eminent domain. Says Mr. Justice Dixon, in *Slingerland v. Newark, supra:* "The object of the condemnation is and its effect will be to vest the land in the city to be used

for its water-supply. Nor is it as though the company were seeking to exercise the power by delegation from the city and so to acquire the land for itself; then would be pertinent that line of decisions which deny the rights of the legislative grantee to delegate its authority to another. The water company acquires no title whatever, and the city acquires title for the specified use only," &c.

Not only did the act of 1888 not give the East Jersey company the power of eminent domain; it did not give it any title to the water. That, the legislature gave to the city, if it gave it to any-one. After the works have been completed, with or without the exercise of the power of eminent domain, the contractor himself has nothing but those works. All that he does, or can do, is, by pumping or otherwise, to divert a part of the stream from its proper course and conduct it by pipes or conduits to the municipality, if the municipality has the right to take it. The municipality alone appropriates it. Neither the contract nor the law gives any right to the contractor to divert for his own benefit. The company has, of course, the right that any other contractor has, viz., the right of selling its own property—whether that property be land or works—to the municipality.

The simplest case is that of the contract entered into between the East Jersey company and Nutley. The agreement bears date December 1st, 1904, and is to continue in force until December 1st, 1914. It provides that the East Jersey company

"agrees to deliver and said town of Nutley agrees to accept a supply of all water needed by the town of Nutley or its inhabitants for private or public uses."

The town of Nutley further agrees to pay

"for all water delivered by said East Jersey Water Company to it, the sum of $100 per million gallons for the first ninety-one million gallons per quarter year,"

and at a lesser rate for the second, &c. If we assume that the municipality has the right to take the water, there is nothing in this agreement that is not warranted by the act of 1888; no assumption of ownership of water; no attempt to exceed the

powers conferred by that act. What the company in effect agrees to do is merely to filter and then to conduct the water from the stream to the town, for the consideration agreed upon. The question presented is whether, by necessary implication, the town has the right to take and appropriate the water to its own use pursuant to the terms of the contract.

When we come to the case of the other municipalities the situation is more complicated.

In September, 1894, Bayonne contracted for a supply of water with two individuals, Washington and Beall. The contractors agree

"to furnish or cause to be furnished, by means of a substantial system of water works, to be operated by them or their assigns, an ample supply of pure and wholesome water, to be delivered from available water sources *into the system of pipes now constructed or hereafter to be constructed* by the party of the second part (the city). The city agrees to receive from the contractors *or their assigns* all the water required for said city and to pay for the same at the following rates, viz., for the first two million gallons consumed each day at the rate of $89 per one million gallons," &c., &c.

On the assumption before made, the contract appears to be unobjectionable in substance. In point of form it is open to the criticism that the city agrees in terms to pay for the water itself, as if Washington and Beall were its owners, and not for pumping, filtering and transmitting it. It is not supposable that Messrs. Washington and Beall intended by so expressing themselves to lay claim to ownership of the water.

The question, in the first instance, is whether this contract gave to Bayonne, as against the state, the right to take from the Passaic as much water as it needed for its municipal uses. But the city not only agreed to receive it from Washington and Beall but also from their assigns. They did, in fact, assign the contract to the New York and New Jersey Water Company, which, like the East Jersey company, was incorporated under the General Corporation act. The assignment was ratified by Bayonne when it afterwards agreed that the term of 'the supply should be extended until 1929. I have no reason to doubt that by the effect of the assignment and ratification, the New York and

New Jersey company acquired whatever rights Washington and Beall had.

But the New York and New Jersey Water Company has never provided the water directly. On July 12th, 1895, it entered into a contract with the East Jersey company, reciting that the East Jersey company "is the owner of numerous sources of water-supply and is willing and desirous to sell water from the same" —a recital not sustained by the proof. The East Jersey company stipulates that it will furnish, or cause to be furnished, to the party of the second part (the New York and New Jersey Water Company) an ample supply of pure and wholesome water, to be delivered from available water sources into the pipe or pipes to be hereafter constructed by the New York and New Jersey company, at such pressure and of such quality as will fulfill the conditions of the said contract with the city of Bayonne, &c.

The contract further provides that the New York and New Jersey Water Company will receive from the East Jersey company all the water required for fulfilling any contracts it may acquire for supplying water to Staten Island; that the same company will construct a pipe line from the corner of Belleville and Kearney avenues in the township of Kearney to the city of Bayonne, and that the East Jersey company shall

"have the right to the use of said pipe line for the conveyance of its water and to tap the same at any and all convenient points for the purpose of conveying water to its customers."

The city of Bayonne is not a party to this contract. Its scope is broader than that of the contract between Bayonne and Washington and Beall, for it contemplates a water-supply for Staten Island and for customers of the East Jersey company, municipal or individual, along the route of the pipe line. Has the East Jersey company, as against the State, any right under this contract to draw water from the Passaic even for the supply of Bayonne. It would seem as if not only Bayonne but the New York and New Jersey Water Company should be heard on this question.

A similar question presents itself in the case of Kearney, Har-

rison and East Newark. Kearney, in the first instance, contracted directly with the East Jersey company for a supply. But the company assigned this contract in June, 1900, to the Kearney Water Company, and it in turn, on July 1st, 1903, assigned it to the New York and New Jersey Water Company and the New Jersey Suburban Water Company. The East Jersey company, notwithstanding its previous assignment to the Kearney company, also assigned to the two companies—for what reason does not appear. The town of Kearney recognized these assignments as valid by resolution adopted August 15th, 1904.

On September 15th, 1903, the town of Harrison made a contract with the New Jersey Suburban company for a supply to continue for fifteen years, and on August 31st, 1906, the borough of East Newark made a contract with the same company for a supply to continue for five years.

In Kearney's case, the present contractors are the New York and New Jersey Water Company and the Suburban company jointly; in the case of Harrison and East Newark, the present contractor is the Suburban company alone. But these companies are not taking the water from the river. It is the East Jersey Water Company which is taking it. In paragraph 3 of the answer it is averred as follows:

"It (the East Jersey Water Co.) admits the establishment of works at Little Falls on the Passaic river and the construction of a filter plant and pumping station there and says that it is the owner of an undivided one-quarter interest therein and it admits that it daily pumps from the Passaic river, at said point, water for the purpose of supplying the inhabitants of Bayonne, Harrison, East Newark, Kearney, Nutley and Little Falls for domestic and public use and that the same amounts to several million gallons of water per day."

No reference is made in this answer to the various contracts and assignments whose terms I have stated. If the answer alone were read, the natural inference, drawn from what is stated, would be that all these contracts were either made or held by the East Jersey company. Carefully perused, its averments are not inconsistent with the facts developed by the evidence. The pleader appears to have thought that the contractual relations of the so-called water companies to the municipalities and to

each other were irrelevant to the present inquiry. It seems to me, on the contrary, that they are of vital importance. On the assumption that the act of 1888 gives the municipality the right to appropriate the water, it is the fact that the contractor has a contract with it which alone justifies him in taking, as against the state, more water than he needs for the use of his riparian land. If it take more and is called to account for it, it must show some legal warrant. If the only warrant be two independent contracts, one made with the New York and New Jersey company and the other with that company and the Suburban company jointly—two companies with no more powers than the East Jersey company possesses—it is difficult to see how it can justify the taking. Standing alone, these contracts are plainly not warranted by the act of 1888. The municipalities are not parties to them or bound by their terms. The first relates, as I have already stated, not only to Bayonne, but also Staten Island and other consumers. The other is the contract under which Harrison, East Newark and Kearney receive their supply. It recites the contemporaneous assignment by the East Jersey company of the Kearney contract, and then it goes on to stipulate that the two companies—the New York and New Jersey company and the Suburban company

"shall take all their supply of water required for all their present and future uses and purposes in that part of Hudson county lying west of the Hackensack river from the East Jersey company."

It further provides that the water to be supplied to Kearney is to be received by the party of the second part (the New York and New Jersey company and the Suburban company)

"through the gates and meter now established for the supply of Kearney and the party of the second part agrees to pay for all water passing through said gates and meter at said point, whether consumed by the township of Kearney or its inhabitants *or otherwise* at the price of $60 per million gallons," &c.

The question then is whether these two contracts can, as against the state, derive support from the fact that the contractees are themselves under an obligation to supply the municipalities named with water? If it cannot, on what other

grounds can the East Jersey company justify the taking? The contracts do not purport to be sub-contracts. Their scope is much wider and, as far as Harrison and Kearney are concerned, they antedate the contracts made with those towns. But it is manifest that these are questions in which both the municipalities and the two companies have an interest and should be heard. If the injunction asked for by the attorney-general should be granted, their supply would be cut off without giving them an opportunity to object.

The defence of estoppel and laches may easily be disposed of. The argument is that the state has stood by for many years and allowed the East Jersey company, without objection, to acquire riparian land, establish a filter plant and reservoirs and lay pipes. These acts could have been lawfully done either by a corporate or non-corporate contractor, and the state could not have objected. If the municipalities have, on any ground, any right to the water, there could be no objection raised on the ground of laches and estoppel merely because the company had been conducting it to them. The state surely could not be charged with notice of the contents of contracts not recorded, and not, as far as appears, publicly stated until the proofs were put in.

As no objection was made in the answer to the absence of necessary parties, and as the state was not informed, until the evidence was taken, as to who some of the parties were, the order will be that the attorney-general have leave to amend within thirty days, and that on failure to do so the defendant may move that the information be dismissed.