THE BOROUGH OF COLLINGSWOOD, PROSECUTOR, v. THE
STATE WATER-SUPPLY COMMISSION.

Submitted December 5, 1912—Decided April 1, 1913.

1. The general effect of the acts establishing a state water-supply
commission (*Pamph. L.* 1907, *p.* 633; *Pamph. L.* 1910, *p.* 551;
*Comp. Stat., pp.* 5797, 5801) is to invest said commission as a
state agency with full control over prospective drafts by munici-
palities, corporations, or private persons upon either surface or
subsurface supplies of water within the jurisdiction and bound-
aries of the state; to charge it as such agency with the duty of
prudently and economically dealing with the supply so as best to
subserve the interests of the people of the state at large and not
the interests of any particular locality; and to vest in the com-
mission a judicial discretion with regard to permitting munici-
palities to draw upon that water-supply, such discretion to be
exercised within the limits laid down by the statute and subject
to review by the courts "for reasonableness, legality and form."

2. When a state tribunal, presumably public spirited and impartial,
has after due hearing passed on a question within its jurisdiction
and with whose determination it is charged by statute, its finding
should not be reversed unless unwarranted in law, or unfounded
in fact, or unless a discretionary power has been plainly abused.

3. The state water-supply commission denied the application of a
municipality for leave to construct municipal water works and to
sink wells as a source of supply, on the ground that as the munici-
pality was already enjoying an adequate supply of good water
furnished by a private company at a reasonable rate, and as there
was nothing to indicate that the supply was likely to become in-
adequate or the quality to deteriorate, the plan proposed was not
"justified by public necessity or reasonably anticipated public
use," as provided in the statute.  *Held,* that as the custodian of
the state's water-supply the commission was warranted in law,
on the facts as found, in refusing the application; that its find-
ing of facts was justified by the evidence, and that its judgment
was neither unreasonable nor illegal.

On *certiorari.*

Before Justices TRENCHARD, PARKER and MINTURN.

For the prosecutor, *Francis D. Weaver.*

For the defendant, *Edmund Wilson,* attorney-general.

The opinion of the court was delivered by

PARKER, J.    This writ brings up for review the refusal of the State Water-Supply Commission to approve the application of the borough of Collingswood to construct and operate a local municipal water plant, to be supplied by artesian wells proposed to be sunk at a specified place within the borough limits. The making and approval of such application, pursuant to the State Water-Supply Commission acts of 1907 (at *p.* 633), and 1910 (at *p.* 551) (*Comp. Stat., pp.* 5797, 5801), was held by the Court of Errors and Appeals to be a condition precedent to the holding of a borough election to authorize a bond issue to pay for the plant. *Wilson* v. *Collingswood,* 51 *Vroom* 626. The jurisdiction of this court by way of review is indicated by section 3 of the act of 1907, and also by section 3 of the act of 1910, which is in many features a re-enactment of the earlier act with the express extension of the jurisdiction of the commission to well, subsurface or percolating water supplies.

At the time of making the application the borough of Collingswood was supplied by a private water company, which maintained wells, a pumping station, standpipe, and a system of distributing pipes and hydrants. The same company also supplied one or more neighboring municipalities. There had been some complaint of inadequacy and impurity in this supply, but it was conceded or fully proved at the hearing before the commission and found as a fact by that body, that both these defects had been remedied and that the supply was adequate and of good quality, and that the rates charged were reasonable.

By section 3 of both acts it is made the duty of the commission on receiving an application of this character, to hold a public hearing, after due advertisement, and after such

hearing to decide, among other things, "whether the plans proposed are justified by public necessity or reasonably anticipated (public) use." The word in parenthesis occurs in the act of 1907 and not in that of 1910, but is plainly intended in the latter act. In the case of surface waters (act of 1907) the commission is also to decide whether the plans "interfere unduly with the opportunity of other municipalities to obtain a water-supply by the taking of waters necessary for their use or whether the reduction of the dry season flow of any stream will be caused to an amount likely to produce unsanitary conditions or otherwise unduly injure public or private interests." *Comp. Stat., p.* 5798. And by the act of 1910 they are to decide more especially with regard to subsurface waters, "whether by taking waters necessary for this use (*i. e.,* public necessity or reasonably anticipated use) they interfere unduly with the opportunity of other municipalities to obtain for themselves a water supply, or whether the taking of subsurface waters will unduly injure public or private interests." The commission within ninety days must either approve or reject the application, or approve it subject to such reasonable terms and conditions as they may prescribe. Its decision "shall at all times be subject to review by the courts for reasonableness, legality and form."

The commission rejected the application *in toto,* putting its action on the ground, among others, that the plans were not "justified by public necessity or reasonably anticipated public use," either in view of the bad quality of the water that was being supplied by the private company, or by excessive rates charged by said company, or by reason of insufficient mains or insufficient quantity of available water; and that previous cause of complaint on this score had been removed. It further held, and as we think correctly, that the desire of the borough to own its own water works so as to make a profit on the water was not a determining factor in the situation, and intimated in addition that it would be unjust "for the public authorities to lend their assistance to injure or destroy a lawful business, conducted as required by law, and in which large sums of money have been invested in good faith."

Upon this last point we do not wish to be understood as expressing any opinion. We confine ourselves, in disposing of this case, to the first ground mentioned. And this leads to a somewhat more extended survey of the jurisdiction of the state over its waters, both surface and subsurface, and the manner in which that jurisdiction has been exercised and the state policy inferable from such exercise; not that either the jurisdiction or the method of its exercise, especially by the statutes affecting the case at bar, has been called in question by the prosecutors; but in order to see more clearly the precise question which we are now called upon to decide.

First, as to the jurisdiction of the state, it is sufficient to cite two or three very recent cases.

In _McCarter, Attorney-General_, v. _Hudson County Water Co._, 4 _Robb._ 695, it was declared by Chancellor Pitney, speaking for the Court of Errors and Appeals upon the act of 1905, hereafter cited, which forbids diversion from the state of the waters of lakes and streams, that:

"It must, we think, be sufficiently obvious that the government established in this state by and for the people thereof has complete dominion (subject only to constitutional limitations) over all things within the borders of the state, including all lands and waters, and the mode of acquiring and disposing of rights of property therein. The fresh water lakes, ponds, brooks and rivers, and the waters flowing therein, constitute an important part of the natural advantages of this territory, upon the faith of which its population has multiplied in numbers and increased in material and moral welfare. The regulation of the use and disposition of such waters, therefore, if it be within the power of the state, is among the most important objects of the government."

In the same case taken by writ of error to the Supreme Court of the United States, Mr. Justice Holmes, speaking for that court (209 _U. S._ 349, 356), said:

"It appears to us that few public interests are more obvious, indisputable, and independent of particular theory than the interest of the public of a state to maintain the rivers that are wholly within it substantially undiminished, except by

such draughts upon them as the guardian of the public wel-
fare may permit for the purpose of turning them to a more
perfect use. This public interest is omnipresent wherever
there is a state, and grows more pressing as population grows.
It is fundamental, and we are of opinion that the private prop-
erty of riparian proprietors cannot be supposed to have deeper
roots."

Similar views are to be found in *Paterson* v. *East Jersey
Water Co.*, 4 *Buch.* 49; *affirmed,* 7 *Id.* 588; and *Wilson,
Attorney-General,* v. *East Jersey Water Co.*, 8 *Buch.* 329.

In 1910 the legislature passed another act (*Pamph. L., p.*
148) forbidding the transmission to other states of subsurface
waters; and this seems to have been recognized by the Court
of Errors and Appeals as being also a proper exercise of the
state's jurisdiction. *Bayonne* v. *North Arlington,* 8 *Buch.*
283, 286; and is logically in line with the important case of
*Meeker* v. *East Orange,* 48 *Vroom* 623, where the right of
a landowner to have the percolating and subsurface waters
on his land remain undisturbed by any but a reasonable use
on the part of his neighbors, was established.

Having glanced at this line of decisions relative to the ju-
risdiction possessed by the state, we come now to an examina-
tion of the manner in which it has been exercised during the
last thirty years or so. This best appears from the following
list, somewhat hastily compiled and therefore not certainly
complete, of the important enactments indicating and declar-
ing the policy of the state to conserve to the utmost its supply
of potable waters:

*Pamph. L.* 1882, *p.* 264, providing for commissions to de-
termine upon plans for the storage of any of the waters of
this state for the purpose of furnishing to cities and towns a
joint water supply. *Comp. Stat., p.* 5795.

*Pamph. L.* 1897, *p.* 99, to prevent pollution of the Passaic
and its tributaries. *Comp. Stat., p.* 5808.

*Pamph. L.* 1898, *p.* 233, providing for commissions to con-
sider the pollution of any stream and devise plans for its pre-
vention. *Comp. Stat., p.* 5810.

*Pamph. L.* 1899, *p.* 73, to secure the purity of the public supplies of potable waters in this state. *Comp. Stat., p.* 5811. Acts with a similar object are *Pamph. L.* 1909, *p.* 213, and *Pamph. L.* 1910, *p.* 337.

*Pamph. L.* 1899, *p.* 536, and 1900 (at *p.* 113), the State Sewerage Commission act. *Comp. Stat., p.* 5816. Supplement, *Pamph. L.* 1907, *p.* 360. The powers and duties of the commission transferred to State Board of Health. *Pamph. L.* 1908, *p.* 605; *Pamph. L.* 1909, *p.* 215.

The various acts relating to the Passaic valley sewerage district (*Pamph. L.* 1902, *p.* 190; *Pamph. L.* 1907, *p.* 22; *Pamph. L.* 1909, *p.* 158; *Pamph L.,* 1910, *p.* 267), and perhaps others, and the general act for district sewerage and drainage commissions. *Pamph. L.* 1902, *p.* 195.

*Pamph. L.* 1905, *p.* 461 (*Comp. Stat., p.* 5794), the act forbidding diversion of water of lakes, ponds and streams into other states, upheld, as already noted, in *McCarter, Attorney-General,* v. *Hudson County Water Co.,* 4 *Robb.* 525; *affirmed, Id.* 695, and further affirmed by the Supreme Court of the United States in 209 *U. S.* 349.

*Pamph. L.* 1910, *p.* 148 (*Comp. Stat., p.* 5795), a similar act relating to subsurface and percolating waters.

*Pamph. L.* 1907, *p.* 633, the State Water Supply Commission act, one of those particularly applying to the case at bar. *Comp. Stat., p.* 5797.

*Pamph. L.* 1907, *p.* 639; amended *Pamph. L.* 1908, *p.* 719, providing for the construction (by the State Water-Supply Commission) of storage reservoirs, the control of flood waters, and the maintenance and regulation of water-supply districts when established by law; conferring power of eminent domain for the purposes of the act, and power to borrow money by issuing bonds. *Comp. Stat., p.* 5806.

*Pamph. L.* 1910, *p.* 551, extending the general jurisdiction of said commission to subsurface waters. *Comp. Stat., p.* 5801.

*Pamph. L.* 1910, *p.* 546, empowering municipalities to contract with the State Water-Supply Commission for a water supply, and empowering the commission to acquire lands and

water rights and acquire or construct water works and to sell water and water power. *Comp. Stat., p.* 5803.

*Pamph. L.* 1911, *p.* 533, a supplement to the last preceding act, authorizing the commission to mortgage acquired property and issue bonds to raise money for the purposes of the act.

*Pamph. L.* 1912, *p.* 557, "An act to authorize the State Water-Supply Commission to acquire lands, water rights and interests therein for the purpose of appropriating or conserving the potable waters of the state to the general and common use of the inhabitants thereof, and to provide for the payment for the said lands, water rights and interests therein and making appropriation therefor;" and providing, in section 4, that "the powers herein conferred on the State Water-Supply Commission are in addition to and not in limitation of any powers or authority heretofore conferred upon it."

It is quite evident, therefore, that the policy of the state is one of determination to conserve, and as we view the matter, to economize to the fullest extent that is reasonable, the water resources of the state for the benefit of all its inhabitants. The growing scarcity of water-supply is a matter of common knowledge, and a great deal of the fiercest litigation in the courts at the present time arises out of disputes over the ownership of water rights. Consequently, in looking at the acts of 1907 and 1910, this policy should be kept in mind; though indeed this is hardly necessary in view of the language of those very acts, for the act of 1907 in its very first section says that the State Water-Supply Commission "shall be charged with a general supervision over all the sources of potable and public water-supply, to the end that the same may be economically and prudently developed for the use of the people of this state."

By section 1 of the act of 1910 the commission is invested with the same jurisdiction over well, subsurface or percolating water supplies now or hereafter furnished to the inhabitants of any municipal corporation as it now has over surface water supplies so furnished except as such jurisdic-

tion and supervision may be modified by the act; and in section 3 of both acts the approval by the commission of an application coming from a municipality "shall constitute the state's assent to the diversion of water," &c.

The general effect of this legislation is to invest the commission as a state agency with the fullest control over prospective drafts by municipalities, corporations, or private persons upon either surface or subsurface supplies of water within the jurisdiction and boundaries of the state; to charge it as such agency with the duty of prudently and economically dealing with the supply so as best to subserve the interests of the people of the state at large and not the interests of any particular locality; and to vest in the commission a judicial discretion with regard to permitting municipalities to draw upon that water-supply, such discretion to be exercised within the limits laid down by the statute and subject to review by the courts "for reasonableness, legality and form."

Coming now to the particular case under review, no question is raised as to the decision of the commission in point of form; nor is any question raised as to the propriety of our review of this decision by this writ of *certiorari.* The precise question, as it appears to us, is—*first*, whether the commission was justified, upon the evidence, in finding that the borough was already adequately supplied by an existing private plant for all its present or reasonably anticipated future needs: and *secondly*, if so, whether that finding reasonably warranted the commission in holding, as it did, that the plans proposed were not justified by public necessity or reasonably anticipated public use. In our opinion the commission was right in both of these respects. Its finding upon the facts of the existence of an adequate plant appears to be fully supported by the evidence and is not seriously disputed; and that the existence of this present adequate supply of good water at a reasonable charge fairly negatives the existence of a public necessity or reasonably anticipated public use for a municipal plant, appears to be too plain for discussion.

It is argued on behalf of the prosecutor that this clause in the statute relates exclusively to the commission's power to deal with the sources of supply so that they may be economically and prudently developed. We are inclined to think that that is so, but we also think that for precisely that reason the commission was justified in its finding that there was no need at the present time for any draft upon those resources by the borough of Collingswood. It is intimated that if the application were granted, the water taken by the borough from the proposed wells would diminish by that extent the water now taken from the company's mains; but if this be true, it does not help the prosecutor, for it may very properly be replied that the water now furnished to Collingswood does not come from the state waters, with the conservation of which the commission is charged, but from the supply belonging to a private company, and by permitting the use of the state's waters for the Collingswood plant, the state resources would be diminished, quite unnecessarily, by just this amount, to the possible future detriment of other municipalities not otherwise supplied.

The decision of the commission was therefore legal, in that it treated the question as one of a proposed draft upon the reserve resources of the state; and we cannot say that it was unreasonable in view of the finding, supported by the evidence, that such draft was quite unnecessary.

We do not wish to be understood as intimating that the mere existence of a present adequate supply from a private agency should necessarily move the commission to reject an application for the approval of a municipal plant; for there may well be other and determining factors in the situation that might lead to an opposite result. Our present decision is that the finding of the commission is supportable on legal grounds and on the facts cannot be said to be unreasonable; and when a state tribunal, presumably public spirited and impartial, has after due hearing passed on a question within its jurisdiction, and with whose determination it is charged by statute, its finding should not be reversed unless un-

warranted in law, or unfounded in fact, or unless a discretionary power has been plainly abused.

The finding of the commission brought up by the writ of *certiorari* will be affirmed.