30 N.J. Super. 409 (1954)
105 A.2d 19
CITY OF BAYONNE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
THE NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 7, 1953.
Decided May 7, 1954.
*413 Before Judges CLAPP, GOLDMANN and EWART.
Mr. William Rubin argued the cause for plaintiff-appellant (Mr. Abraham J. Slurzberg on the brief).
Mr. Oscar R. Wilensky argued the cause for defendants-respondents (Messrs. Oscar R. Wilensky, Horace S. Bellfatto, Robert J. McCurrie, Samuel Allcorn, Jr., Thomas J. Markey, James E. Fagan and Benjamin J. Spitz, attorneys).
The opinion of the court was delivered PER CURIAM.
The City of Bayonne brought suit for a declaratory judgment, seeking a construction of N.J.S.A. 58:5-26 and also asking the court to fix the price currently chargeable under that statute for water now being supplied it by the North Jersey District Water Supply Commission. The commission operates the Wanaque Reservoir, and it has now completed and put into use, apparently since the trial below, the Ramapo project. The trial court held that a judgment entered in a 1941 action is res judicata as to most of the questions raised, and accordingly gave judgment against the city. The city appeals. We will deal with the counterclaim later.

I.

Are the issues raised in the complaint res judicata?

Is the plaintiff estopped or in any way precluded from raising those issues?
The 1941 action was brought by the commission against Bayonne for water sold by it to the city for five months in *414 1941. Apparently the commission was then suing as trustee under an agreement made December 26, 1940 for the benefit of municipalities participating in the Wanaque project. It did not sue on the theory that it was entitled to recover under N.J.S.A. 58:5-26, and the Circuit Court judge in his charge to the jury, and the commission's counsel at the trial, made this clear.
It is true that in the 1941 action the court allowed evidence to be admitted as to the cost of water and, in its charge, seems to say that in fixing the reasonable value of water sold by the commission to a municipality apart from the statute, costs calculated under the formula fixed by N.J.S.A. 58:5-26 should be taken into consideration "so as not to give an unfair advantage" to the vendee. This, however, was said not on the theory that the suit was based on N.J.S.A. 58:5-26 but on the theory that such costs were one element to be considered by the jury in determining what constituted the reasonable value of the water, apart from the statute.
The cause of action prosecuted in the 1941 suit was obviously not the same as that presented here under N.J.S.A. 58:5-26. The question whether two causes of action are the same may at times present difficulties. Bango v. Ward, 12 N.J. 415 (1953). But not here.
Where the causes of action are different, there is no ground for invoking the doctrine of res judicata unless a point to be determined in the later action was in fact litigated and determined in the earlier action. Here, however, the court in the 1941 action made no ruling or determination as to the effect of any provision of the statute. The doctrine of res judicata is therefore plainly inapplicable. Miller v. Stieglitz, 113 N.J.L. 40 (E. & A. 1934); Templeton v. Scudder, 16 N.J. Super. 576 (App. Div. 1951); Restatement of Judgments, § 68 (2) and comments.
Moreover, the mere fact that Bayonne has for years bought water from the commission, as trustee as stated, apart from the provisions of N.J.S.A. 58:5-26, obviously does not estop the city from availing itself of those provisions. Nor is there anything to indicate that the parties thought *415 their dealings were made with reference to the statute or that by those dealings they were placing a construction upon it. There is therefore no basis for invoking the rule, relied upon by defendants, that a construction put upon an ambiguous statute in practice may be resorted to in determining its significance. Offhouse v. State Board of Education, 131 N.J.L. 391 (Sup. Ct. 1944); 82 C.J.S., Statutes, § 357, p. 758.

II.

Adequacy of Supply
That brings us to the principal question in the case, namely, what construction is to be put upon N.J.S.A. 58:5-26. N.J.S.A. 58:5-25 provides that where a municipality desires to take water from any plant, it may file a petition, and the commission is thereupon obliged to call a hearing of the municipalities then under contract with the commission in relation to the water supply. Then follows the statute brought before us for construction, reading in part:
"After such hearing, the commission, if the water supply under its control is adequate for the supply of the applying municipality, may contract with the municipality for the supply to it of water at such price as shall impose upon the municipality an equitable share of the cost of constructing, acquiring and operating such supply * * *."
The chief difficulty is with the italicized words "if the water supply under its control is adequate." "Adequate" after providing for what? The draftsman of the statute has left us with hardly a clue. Does the statute mean, as defendants contend, "adequate" after providing the participating municipalities with the water allotted to them under contracts, even though they do not use the water? If so, there is none available, since (as we are informed) the entire yield of the Wanaque and Ramapo projects has already been so allotted. Or does it mean  as we think it does  "adequate" after providing for the current demands of the participants? Under this latter construction, the commission may dispose *416 of the unused allotments. Indeed, Bayonne has been availing itself of these unused allotments since 1930.
The words of the statute perhaps give rise to a faint suggestion that the Legislature was dealing with unused water, and not with the water remaining after contractual allotments have been provided for. For the statute states that "the water supply" must be "adequate for the supply" of the applicant; and it might perhaps be drawn from this language that the statute had in view, not the matter of allotments, but the adequacy of the supply to meet the demands of the contracting municipalities. But this is much too thin a suggestion to be made the basis of this decision.
We must look deeper into the matter. The State undoubtedly is under a duty to control and conserve its water resources for the benefit of all its inhabitants. City of Trenton v. State of New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1922). And indeed the great concern which the State has in those resources has been spoken of in our cases. Collingswood v. State Water Supply Commission, 84 N.J.L. 104, 110 (Sup. Ct. 1913), affirmed 85 N.J.L. 673, 674 (E. & A. 1913). To meet these public obligations in a measure, the Legislature created the North Jersey District Water Supply Commission. Its public responsibilities are reflected in various parts of the law. Thus in N.J.S.A. 58:5-27 (Borough of Oakland v. Board of Conservation and Development of the State of New Jersey and the City of Bayonne, 98 N.J.L. 806 (E. & A. 1923)) it is made unlawful for any municipality to obtain, without the commission's consent, a new or additional water supply. Again, in N.J.S.A. 58:5-24 the commission is required to hold its water supply plant, works and appurtenances, in trust, not only for the contracting municipalities, but also for such municipalities as may in the future be "entitled" to share in the water supply.
A municipality has a duty to provide for its future, and in this case the participating municipalities have, in buying up allotments, contracted to take more water than they presently need in order to establish reserves for their *417 future. However, it seems unreasonable to suppose that the Legislature in allowing the commission to sell the water, if the supply is "adequate," contemplated that a municipality could contract for the entire yield and leave the commission without further authority to deal with other municipalities applying for water. That would enable the contracting municipality to reject the application of any other municipality wholly at its whim and allow the water, which it has no use for, to go over the dam. With these considerations in mind, we have concluded that the commission under N.J.S.A. 58:5-26 had the authority to sell "unused allotments" (as it is termed in the commission's contracts).
The mere fact that the demands of the participants may exceed the supply perhaps after 1962 (we do not determine the matter) does not prevent Bayonne from sharing in that supply until the supply becomes inadequate to meet the requirements of the participants. A contract under N.J.S.A. 58:5-26 may be made terminable on such reasonable notice as comports with public policy. Indeed we are informed that water is now being supplied Bayonne on a day-to-day basis.

III.

Significance of the word "may." The power to enter into voluntary arrangements.
The word "may," italicized in N.J.S.A. 58:5-26 above, is also obscure. This word is to be given a mandatory significance where it is employed in a statute to delegate a power, the exercise of which is important for the protection of public interests and where, it can clearly be taken from the nature and the object of the statute, a mandatory significance was intended. Kennelly v. City of Jersey City, 57 N.J.L. 293 (Sup. Ct. 1894); McDonald v. Board of Chosen Freeholders of Hudson County, 99 N.J.L. 170 (E. & A. 1923); Leeds v. Harrison, 9 N.J. 202 (1952); Maxwell, Interpretation of Statutes (8th ed.), 1937; 3 Sutherland, *418 Statutory Construction (3rd ed.), § 5803; Endlich, Interpretation of Statutes, p. 416 (1888).
The word "may" here doubtless was used because the draftsman felt he could not require the commission to enter into a contract, if the applying municipality was unwilling so to do; he did not take the trouble to spell out the thought of the statute, as we understand it. Indeed, that requires some elaboration to be made on its terms. In the first place we think the statute means that the commission is given the power to enter into the contract. Cf. the phrase "have power to," found in L. 1916, c. 71, § 18, as amended by L. 1924, c. 190, § 4, from which N.J.S.A. 58:5-26 was derived on the revision of the statutes in 1937; Crater v. County of Somerset, 123 N.J.L. 407, 414 (E. & A. 1939).
In the second place  and this is the mandatory aspect of the statutory provision  we think the commission is obliged to enter into such a contract, if the applying municipality is willing to do so on the basis of a price to be fixed under the statutory formula. The policies with regard to the conservation of water, of which we have already spoken, are involved here. It seems unreasonable to suppose that the Legislature, by the use of the word "may," gave the commission a power at its own fancy to refuse an applying municipality a share in the water where an ample quantity of it is available and would otherwise go over the dam. East Jersey Water Co. v. City of Newark, 98 N.J. Eq. 672, 676 (E. & A. 1925). Why did the Legislature make a hearing compulsory and require notice to be given to every contracting municipality if, notwithstanding the adequacy of the water supply, the commission were to have such an extraordinary public power? The commission was not a private merchant; it was in a number of respects a public trustee and public curator.
Notwithstanding that the word "may" is to be construed mandatorily in the portion of N.J.S.A. 58:5-26 above quoted, still it does not follow that the words "may allow" appearing in the next portion of the statute are to be construed to mean "shall allow." Cf. Kennelly v. City of Jersey City, 57 N.J.L. 293 (Sup. Ct. 1894), supra, where *419 the word "may" was held to have been used in a single section of a statute in one place with a permissive significance and two other places with a mandatory significance.
The commission has in the past (North Jersey etc. Commission v. State Water, etc., Commission, 129 N.J.L. 326, 327 (Sup. Ct. 1943)), acted as agent or trustee for participating municipalities and on their behalf has sold water allotted to them. Such sales have been made either at some price contracted for, other than that fixed under the statutory formula, or on a quantum meruit basis. We think the commission has the authority to make such sales as agent or trustee (cf. N.J.S.A. 40:62-49b; 40:62-49d; 40:62-84) quite aside from the provisions of N.J.S.A. 58:5-26, and indeed, by virtue of that authority, is entitled to recover on its counterclaim, as hereinafter stated. However, notwithstanding the opportunity it may have to enter into such a voluntary arrangement, any municipality, we conclude, has a right under the statute to require a share in the water that is not being used, provided it is willing to pay the price fixed by the statutory formula.
Of course, any municipality so sharing in the water supply under N.J.S.A. 58:5-26 takes subject to the demands made under existing contracts. We need not deal with questions of priority which might arise if participating municipalities might hereafter contract with other municipalities for the sale of their own unused allotments; we are concerned here only with allotments not called for.

IV.

An equitable share of the cost. The necessity of filing a petition.
The next question before us has to do with the construction to be put upon the statutory words above quoted, N.J.S.A. 58:5-26, providing for such price as shall impose upon an applying municipality "an equitable share of the cost of constructing, acquiring and operating such supply." In this regard, a number of questions are raised.
*420 We deal first with the price chargeable with respect to the cost of constructing and acquiring the supply. The commission calculated the capital cost of the Wanaque project at $31,000,000 and suggested that Bayonne be charged 4.65% thereon annually. This percentage constitutes the average actual interest rates which the participating municipalities paid on bonds issued by them to pay for the project. The first point made by Bayonne in this regard is that the books and audit reports show that the total costs of the project came only to $26,267,451.53. The difference may (the matter is not clear) be made up entirely of interest paid by municipalities during the course of construction. This is a proper cost; it constitutes an expense reasonably necessary before the water became available.
Bayonne next claims that it should pay interest only on that portion of the bonds issued by the participating municipalities, which are outstanding. On December 31, 1951 the total outstanding bonds amounted to $16,047,000. In other words, Bayonne seeks to benefit because the participating municipalities have paid off some of their bonds. The argument is plainly untenable. The statute deals with the cost of constructing the supply. The commission contends that charging interest on the original cost is the applicant's equitable share of the cost, and in that, it is clearly not being unreasonable.
We come now to costs of operation. Bayonne concedes that depreciation calculated upon the cost is a proper charge in determining costs of operation. The commission refuses to admit this and seeks, instead, to impose a charge for the annual amount being paid out by the municipalities by way of amortization on their bonds. Bayonne is clearly right in this. It should not be made to pay off the participating municipalities' capital investment. It should be borne in mind that after the bonds are paid off the municipalities which financed the project will (unless some other municipality is allowed to come in as a part owner under N.J.S.A. 58:5-26) own it free and clear.
*421 The power to determine what quantity constitutes an adequate water supply and the price due under the statutory formula (including the item of depreciation) were matters entrusted to the commission for determination, in the light of the construction put upon the statute by the courts, and after hearing the interested municipalities. These determinations are part of the commission's administrative responsibility, lying within its special competence, subject of course to the limited superintendency provided (see R.R. 4:88-8) by procedure in lieu of prerogative writ. In re Plainfield-Union Water Co., 11 N.J. 382 (1953).
In order to secure such an administrative determination, a petition should be filed under N.J.S.A. 58:5-25 and proceedings taken as provided therein. No such petition was filed here, and there is no basis for Bayonne's claim to the contrary. The only petition here was one under N.J.S.A. 58:5-9 having to do with the Ramapo diversion. There may have been a proper petition in 1929, but that of course is not before the commission now.
At the time the petition is filed, the commission will have no difficulty with a question now raised by Bayonne as to whether there should be included in the price the cost of constructing the Ramapo project. Under N.J.S.A. 58:5-23 it is provided, in connection with the charging of participating municipalities with a share of the cost of operation, that "no municipality shall be charged with any item of interest or rental upon, or cost of operation of, any part of any water plant which is not used in supplying water to the municipality * * *." Bayonne's point is that it should not be made liable for the cost of constructing the Ramapo project before the project had been completed. However, by the time the petition is filed the project will have been in operation for some time, and any contract that may be entered into on the basis of that petition will not be retroactive. Bayonne's obligations as to water received between January 1, 1952 and the time of the contract, are dealt with below in connection with the counterclaim.
*422 Bayonne does not suggest that it get water from the Ramapo project without sharing in the costs of the Wanaque project. In fact Bayonne's counsel has said in the course of the hearing below that if "there is going to be a surplus in the Ramapo diversion, we agree to suffer by whatever water goes over the dam too. We want to be bound by it." It would appear therefore that all parties will regard the Wanaque and Ramapo projects as, so to speak, merged into one water plant for the purposes of fixing annual costs of operation under the statute.

V.

Counterclaim
The counterclaim here is for water sold by the commission to Bayonne from January 1, 1952 to September 1, 1952. However, the judgment against Bayonne covers water sold it from January 1, 1952 to the date of the judgment, namely, May 27, 1953; and the pretrial order seems to have left it to the court to fix the reasonable value of water sold by the commission to Bayonne pending the disposition of the litigation.
The court below held that the reasonable value of the water amounted to $102.50 per million gallons. The figure was arrived at in this fashion: under the doctrine of res judicata, the court held itself bound by the determination in the 1941 action to the effect that the reasonable price of water sold by the commission to Bayonne in 1941 was $85 per million gallons; and the court then added to that figure the increases in cost to which the commission had been subjected since 1941. We do not think the court's method was sound, but need not necessarily determine the matter, as we find the reasonable value to be $102.50 per million gallons.
Quite apart from the judgment entered in the 1941 action, the proofs below establish the figure of $102.50 to be reasonable and are indeed rather one-sided on the matter. There was no evidence to the contrary, except some proof showing that the commission should calculate its costs at *423 less than that which it has done. We have, in construing the statutory provision as to an "equitable share of the cost," dealt with most of the questions raised by this proof. However, it should be borne in mind that cost is but one factor in fixing reasonable value (Luse v. Jones, 39 N.J.L. 707 (E. & A. 1877) and Savarese v. Hartford Fire Insurance Co., 99 N.J.L. 435 (E. & A. 1923)) and, more than that, that reasonable value of water sold may properly return to the municipalities making the sale, something by way of profit, which is a matter not to be taken into account under N.J.S.A. 58:5-26. We think the evidence very preponderantly supports the charge which the commission has made for the water, namely, $102.50 per million gallons.
Judgment below modified in accordance with this opinion, but without costs on the appeal.