THE BOROUGH OF OAKLAND ET AL.. APPELLANTS, v. THE BOARD OF CONSERVATION AND DEVELOPMENT OF THE STATE OF NEW JERSEY AND THE CITY OF BAYONNE, RESPONDENTS.

Argued March 7, 1923—Decided September 21, 1923.

1. When a municipality seeks approval by the board of conservation and development to the obtaining by it of a new or additional water supply from any watershed or sheds other than that from which it was then obtaining its supply, it must first secure the consent of the district water supply commission. Section 18 of chapter 71 of the laws of 1916, requiring such consent, is not abrogated by article 32 of the Home Rule act of 1917.

2. A tributary river having its own watershed. as source of supply, and which empties into a large river, cannot be said to have the same watershed as the other river merely because it loses its identity when it enters a larger stream.

3. Where a *quasi*-judicial body is vested by statute with jurisdiction to hear and determine a certain matter, the statutory facts conferring jurisdiction must be alleged in the application and not be left to inference.

4. A statutory notice of a public hearing before a public body on the application of a municipality for approval of plans for obtaining a water supply, which plans include the construction of a dam and other works in a certain county, which notice was required to be made by advertisement in one or more newspapers "published in the vicinity," is not satisfied by advertisements in newspapers published in other, although adjoining, counties. The notice should have been published in at least one newspaper of the county where the works and dam were to be erected.

5. Where the legislature confers powers upon a board, to be exercised by it without expressly authorizing that the powers conferred may be exercised by less than a quorum, and there is no provision as to the number of members necessary to act in the exercise of such powers, the majority of the whole board will constitute a quorum and may act.

On appeal from the Supreme Court, whose opinion is reported *ante p.* 99.

For the appellants, *J. W. & E. A. De Yoe, Francis Scott, Edward F. Merrey, Clarence Mabie, Fred W. Van Blarcom, Spaulding Frazer, Frank H. Sommer* and *John W. Griggs.*

For the respondent board of conservation and development, *Thomas McCran,* attorney-general, and *William Newcorn,* assistant attorney-general.

For the city of Bayonne, *John Millon* and *Aaron A. Melniker.*

The opinion of the court was delivered by

KALISCH, J.   The questions which are presented for determination grow out of the action of the board of conservation and development in granting its consent to, and approval of, the application and plans presented to it, by the city of Bayonne, on the latter's written application, filed with the board on February 21st, 1921, for the diversion of fifty million gallons of water daily, to the end that it may obtain an additional water supply from the Ramapo river shed, without having first obtained the consent of the North Jersey

district water supply commissioners. The East Jersey Water Company was and is supplying Bayonne with water taken from the Passaic river at Little Falls, under a contract with that municipality, which contract will expire in 1929. Ramapo river is a tributary of the Passaic.

The municipality stated in its application that it was made in compliance with the provisions of chapter 252, *Pamph. L.* 1907, *p.* 635, and chapter 304, *Pamph. L.* 1910, *p.* 551. The application was originally for a diversion of a maximum of one hundred million gallons of water daily, and was subsequently amended to fifty million gallons. The additional water supply was to be obtained from the Ramapo river watershed, the point of diversion being located in the valley below Suffern, in the State of New York, but within the State of New Jersey, and for the purpose of supplying water to Bayonne and such other municipalities as it may enter into contract with for water supplies. The application, after giving a general description of the area of the Ramapo river watershed and of the river, proceeds to state that the latter is thirty-four miles in length and rises in Orange county, in the State of New York, and is a branch of the Passaic, into which river it empties; that the general plan is to construct a storage reservoir in the State of New Jersey, below Suffern, and to convey the water through pipes by gravity to Bayonne. The application further set forth that a survey of the watershed was being made and such additional information as would be obtained would be furnished to the board on the hearing of the application. On February 24th, 1921, the board fixed a time and place for hearing and gave notice thereof by publication in newspapers printed in Hoboken, Jersey City, Newark and Paterson, and not elsewhere. It was not until March 3d, 1921, ten days after the filing of the application, that general data regarding the water supply system were furnished. There was no mention made in the application of any particular place in New Jersey where the reservoir was to be located, nor was there any description and capacity of the proposed reservoir given. The general data furnished ten days after the filing of the application must

be resorted to in order to obtain any information in that regard. There were several hearings, some four or five, held by the board, and at which sessions witnesses were sworn and testified to matters which were deemed to be material and pertinent to the inquiry stirred by the application and necessary to be considered by the board in order to properly determine whether or not the application should be granted. At none of these sessions, it appears, were there more than three members of the board present, one session being held by a single member alone, and the three members who did sit, on no occasion were the same three who sat at the first and succeeding sessions, with the exception of the hearing on July 7th, 1921, when seven of the eight members comprising the board were present.

The application of Bayonne having received the approval and assent of the board, its order and the proceedings upon which it was made was brought for review by writ of *certiorari* into the Supreme Court, and by that tribunal affirmed, and from which judgment of affirmance this appeal is taken.

The principal contention for a reversal of the judgment is that the board of conservation and development was without jurisdiction to entertain and consider Bayonne's application, because it appeared from the application itself that it was for a new and additional water supply from a watershed other than from which the municipality was then obtaining its supply of water, and, therefore, before such application could be lawfully received and considered by the board, it required the consent of the North Jersey district water supply commission, and no such consent had been obtained.

As supporting this contention reliance is placed on section 18, *Pamph. L.* 1916, *ch.* 71, *p.* 139, which, among other things, provides that whenever any district commission should come into existence under the act it should be unlawful for any municipality within the district to obtain any new or additional water supply from any watershed or watersheds other than that from which the municipality was then ob-

taining its supply, without the consent of the district water supply commission.

This legislation forces prominently to the foreground the inquiry whether or not the application of the municipality in the present case is for a new and additional water supply from any watershed other than from which it is obtaining its present supply. If it is, then consent of the district commission was a necessary and an essential step to be taken by the applicant before it could lawfully make its application to the board. The lack of such consent would leave the municipality without any legal status to make the application and the board without any jurisdiction over the subject-matter.

For the respondent it is argued that section 18 relied on by the appellants, has been abrogated by virtue of article 32 of chapter 152 of the Home Rule act of 1917; but it is clear from a plain reading of its provisions that while it is true that much of the machinery constructed and powers conferred by the statute of 1916 was superseded by the statute of 1917, the existence of the two district boards of water supply commissioners created by the statute of 1916 was not thereby terminated and their powers remained unimpaired, except to the extent that they have been extinguished by the later statute. One of the powers which, obviously, did not thus become extinct is the power conferred on the district boards to consent or withhold consent where a municipality proposes to obtain a water supply from a source other than from which its present supply comes.

But it is further insisted that even though section 18 is in full force, nevertheless it is not applicable to the situation presented by Bayonne's application, because it is not seeking a new and additional water supply from any watershed or watersheds other than that from which its supply comes. In support of this position it is argued that Bayonne receives its water supply from the Passaic, at Little Falls, under a contract with the East Jersey Water Company, which in turn obtains its water supply from the Passaic river watershed, which is in the same area as that of the Ramapo and, as a

logical sequence, the Ramapo is a component part of the Passaic river, and, therefore, the application of the municipality is for an additional supply from the original source. The fallaciousness of this argument is apparent. The Ramapo river is a tributary and not a branch (as was suggested in the argument) of the Passaic river. As a tributary it is an independent stream, having its own separate watersheds. It is a matter of common knowledge that a tributary is, in its nature, an independent stream, relying on its own watersheds as sources of supply and having its outlet in some larger body of water, whereas a branch of a river receives its water from the stream from which it extends and is wholly dependent for its supply and existence on the parent river of which it is in fact a component part, in like manner as is the branch of a tree a part of the tree itself. The Passaic river has many small tributaries which at one point or another contribute to its flow outside of the Passaic watersheds. It does not follow, as a logical sequence, because of that fact that these rivers lose their identity as independent streams, and that thereby their watersheds are those of the Passaic any more than it would follow that the Passaic watersheds were also the watersheds of those rivers emptying into the Passaic river. So the only effect of the flowing of the Ramapo river into the Passaic and thus mingling with its water is to render such water from the point of entrance, Passaic river water, and nothing else. Therefore, the proposal by Bayonne to dam the Ramapo above its confluence with the Passaic for the purpose of supplying it with an additional water supply is manifestly an attempt by that municipality to secure such supply of water from a source other than from which it is now supplied, without having first obtained the consent of the district commission. That the municipality is seeking such new and additional water supply is not only made clear by its written application, but also by the proceedings had thereunder.

But, even on the respondents' theory that the application by the municipality was a proper one to make, without the consent of the district supply commission, under the statutes

of 1907 and 1910, it is quite apparent that the application was radically defective in failing to comply, in material respects, with the requirements of the provisions of those statutes, and in consequence the board was without jurisdiction to deal with the subject-matter of the application.

The board of conservation and development is not a purely administrative body, but is also invested with limited *quasi*-judicial functions. Its jurisdiction to entertain an application is derived from statute and in order to properly invoke the jurisdiction of this statutory tribunal all the conditions prescribed by the statute must appear to have been complied with. The statutory facts conferring jurisdiction must be alleged and not left to be inferred. These legal principles are elementary and need no citation of cases to support them.

Section 2 of the statutes of 1907 and 1910, *supra,* provides, *inter alia,* "No municipal corporation * * * shall have power to condemn lands or water for or divert from any new or additional source of water supply, until it shall have first submitted to the commission descriptions thereof, which may be accompanied by maps and plans and the commission shall have approved the same." * * *

Section 3 provides that· "Any municipal corporation * * * may make application in writing to the commission for approval of its plan for obtaining a new or additional water supply. * * * The application shall show the sources of proposed supply, the approximate location of * * * reservoirs or other works, with their estimated capacities, an abstract of any official reports relating to the same, the need for an added supply and the reasons for the choice made."

Turning to the application in question we find it to be most vague and uncertain in those material respects which the provisions of the statute require to · be precise and definite. Thus as instances of the utter disregard of the statutory requirements in the respect mentioned, the application states the point of the proposed diversion for the purpose of supplying water to the city of Bayonne, &c., as being located in the valley below Suffern, New York; but in the State of New Jersey; that the general plan is to construct

a storage reservoir within the State of New Jersey and in the valley below Suffern, New York, and to convey the water through pipes by gravity to Bayonne. No attempt is made to show the approximate location of the proposed reservoirs or other works, nor their estimated capacities, as required by the statute. The application discloses that at the time of its filing the municipality was not in possession of the essential facts required by the statute to be set forth in order to invoke the jurisdiction of the board, but the municipality appears to have contented itself with a promise in its application to furnish the board with the results of a survey which was being made, and other data concerning the same on the hearing of the application. There was such general data, rather indefinite in character, filed with the board after the application was received and entertained by the board and had been acted upon by it. It is difficult to conceive how it can properly be said in any sense that the general data furnished by an advisory water engineer of New York City, to the board under the circumstances narrated, became a part of the application filed by the city of Bayonne, and was a compliance with the statutory requirements as to what the application should contain in order to invoke the jurisdiction of the board. What was done to supply jurisdictional facts demonstrates that the application was prematurely made and was radically defective as filed in that there was an absence of jurisdictional facts.

The two questions, among others, argued in this case and to which we have given attention and consideration relate to the procedure of the board upon the application in question.

Section 3 of the statutes of 1907 and 1910, *inter alia*, provides: "The commission shall give notice, by advertisement in one or more newspapers published in the vicinity, of a public hearing, at which all persons or municipalities affected by the proposed plans may be heard for or against the granting of the application."

The dam was to be located at Oakland, in Bergen county. What the legislature meant "by advertisement in one or more

newspapers in the vicinity" cannot be open to serious controversy. The legislature declares the purpose of the advertisement to be thus: "That all persons or municipalities affected by the proposed plans may be heard for or against the granting of the application." As the proposed works were to be located in Bergen county, naturally landowners *in the vicinity* where the dam was to be located and whose lands were subject to be taken would be more nearly affected by the project than would municipalities who had more or less contingent interest in the source of supply.

But, however that may be, the board failed to advertise the project in any newspaper in Bergen county, notwithstanding that two out of the numerous newspapers published throughout the county were being published in the vicinity where the works were to be located; but instead the board caused the advertisement, required to be made by the statute, to be inserted in newspapers, the places of publication of which were in Newark, Passaic and Hoboken.

As a general rule courts will accept the meaning of words in ordinary use found in a statute in their generic sense unless there appears clearly a legislative intent to the contrary.

Therefore, in order to decide what meaning to give to the word "vicinity" we must seek the legislative intent. While the word "vicinity" may be broad enough, in its generic sense, to include an entire county or a neighboring county or counties (for artificial boundary lines or political divisions have no particular relevancy to the question of the nearness or remoteness of one town from another) ; nevertheless, when the word "vicinity" is found in a statute its import must largely depend on the nature of the subject-matter to which it relates. This seems to be a logical deduction from the view expressed by this court in *Madison* v. *Morristown Gas Co.,* 65 *N. J. Eq.* 356.

That the legislature intended that the statutory notice shall be inserted in a newspaper published in the neighborhood of the place where the works were to be located seems

to be indicated by the terms of the statute itself, by providing that such notice shall be published in one or more newspapers. The legislature evidently had in mind that as there may be owners of lands at other places besides the places where the works were to be located, whose lands might be affected, and municipalities who had an interest in the source of supply, that they also should have notice by publication in a newspaper published in the vicinity where such lands and the municipalities in interest are located. For the object of the statute as expressed is "that all persons or municipalities affected by the proposed plans may be heard for or against the granting of the application."

It seems to us there can be no legal excuse why the statutory notice was not inserted at least in a newspaper published in Bergen county. The failure to do so voids the entire proceedings, since publication of the notice is made by statute one of the methods which confers jurisdiction on the board to hear and determine whether or not the application should be granted. The principle enunciated here is well recognized in the law, and in *Stone* v. *Stone,* 28 *N. J. Eq.* 409, Vice Chancellor Van Fleet points out with great perspicacity the elements of a valid publication of statutory notice necessary to confer jurisdiction.

There is another fatal objection to the procedure adopted by the board in the hearing of the application of the municipality, in that at none of the hearings except on July 7th was there a quorum of the board present.

By virtue of the third section of the statute of 1907 the board, after due hearing, shall decide whether the plans proposed are justified by public necessity or reasonably anticipated use, and whether such plans interfere unduly with the opportunity of other municipalities to obtain a water supply, by the taking of waters necessary for their use or whether the reduction of the dry season flow of any stream will be caused to an amount likely to produce unsanitary conditions or otherwise unduly injure public or private interest.

Thus it is. to be observed that the board was required as a *quasi*-judicial tribunal to decide many important factual questions which required the swearing in and hearing of witnesses and a consideration, of their testimony. The statute prescribed a "due hearing," which is a hearing according to law. Such a hearing was not had.' The fact that the hearings were had and conducted without objection by counsel of appellants and, therefore, their consent thereto will be implied, is of no importance. Consent to go on before a lesser number than a quorum cannot confer jurisdiction which the statute prescribes shall be exercised by the board. Jurisdiction, therefore, could not be lawfully conferred, by consent of parties or of counsel, upon a single member of the board or any number less than a quorum, for such action would be in defiance of an express statutory behest that the board shall hear and determine the merits of application, in the manner prescribed by the statute.

Where the legislature confers powers upon a board to be exercised by it, without expressly authorizing that the power or powers conferred may be exercised by a less number than a quorum, and there is no provision made as to the number of members necessary to act in concert to exercise the power or powers conferred on the board, by the statute, then the common law rule prevails that a majority of the board constituing a quorum may lawfully act. *Barnert* v. *Paterson,* 48 *N. J. L.* 395, 400; *Public Service Railway Co.* v. *General Omnibus Co.,* 93 *Id.* 344, 351.

As the express language of the statute is that "after due hearing the commission shall decide," &c., there can be no question but what it was intended that the matter could be heard by all the members of the commission or at least by a quorum. *Herbert* v. *Atlantic City,* 87 *N. J. L.* 98, 102; *Apple* v. *Atlantic City,* 104 *Atl. Rep.* 89; *Brennan* v. *Jersey City,* 104 *Id.* 90; *Crane* v. *Jersey City,* 90 *N. J. L.* 109; affirmed on opinion by this court, 92 *Id.* 248; *Foley* v. *Orange,* 91 *Id.* 554; *Hewson* v. *Newark,* 95 *Id.* 28.

The views expressed lead to the result that the judgment of the Supreme Court, affirming the order and proceedings of the board of conservation and development must be reversed and that the order and proceedings of the board must be set aside.

PARKER, J. (concurring in result).

I concur with the majority opinion on all points except that relating to the differentiation of the Ramapo "watershed." The argument seems to be that because the Ramapo is a tributary of the Passaic, the "watershed" of the Ramapo is no part of, and a different thing from the "watershed" of the Passaic, and hence within the inhibition of the act of 1916. *Pamph. L., p.* 129 *et seq.* The exact language of the pertinent paragraph on page 139 should be noted. It reads: "Whenever any district commission has been brought into being by virtue of this act, it shall be unlawful for any municipality within the water supply district represented by said commission to obtain any new or additional water supply from any watershed *other* than the watershed *or watersheds* from which said municipality obtains its existing supply, without the consent of said district water supply commssion."

The word "watershed," in a geographical sense, has two meanings, as defined in Webster's International Dictionary: (1) Water parting, or "divide." (2) The whole region or area contributing to the supply of a river or lake; drainage area; catchment basin. It is plainly the latter sense in which the legislature has used the word.

I agree that the Ramapo is a tributary of the Passaic. So, also, are the Wanaque, the Rockaway, the Pequannock and the Whippany, directly or indirectly; and if we are to say that the Ramapo watershed is distinct from that of the Passaic, the watersheds of these other four rivers must likewise be distinguished. It may well be that a city drawing originally from the Wanaque is forbidden to obtain an additional supply from the Rockaway without the statutory consent; but when all these rivers are combined into the Passaic

and the original supply has been drawn from the Passaic below their confluence, the statute applies to the Passaic watershed as a whole, i. e., in the language of the lexicographers, the whole region or area contributing to the supply of the river.

The other view seems to lead to an absurdity. Separating these five watersheds from the Passaic, that river above the confluence of the Rockaway and Whippany, while still a respectable stream, has as its tributaries Dead river, coming from Liberty Corner; Black brook, from the Great Swamp; Great brook, from Green Village; Primrose brook, emptying into Great brook, as the Whippany empties into the Rackaway; besides innumerable smaller feeders not named on the maps. Each of these, according to the reasoning of the opinion, as I view it, has its own "watershed" reserved from appropriation without consent of the district commission, and all that is left of the Passaic is a little rill rising at a spring near Mendham. It can never be reasonably claimed that an intake on the Passaic at Little Falls draws solely from this brook in disregard of the tributary streams mentioned. The Passaic watershed, in the ordinary and proper sense, includes every drop of water that normally would find its way into that river, and necessarily embraces the tributary watersheds.

Such a meaning was adopted by this court in *Fagen* v. *Wharton*, 95 N. J. L. 254. In that case, the facts were that Wharton was drawing its existing supply from Spring brook, a tributary of the Rockaway, and desired an additional supply from the Rockaway itself. In dealing with this very statute, we adopted the opinion of the Supreme Court, which said: "The evidence shows that this application is for water *from the present watershed.*"

As to the posisble suggestion that Bayonne in the present case is not within the statute because it buys from the East Jersey Water Company, the logical result would be precisely the reverse of that reached by the court, for if Bayonne be not drawing from any watershed the prohibition is inap-

plicable. But this would seem to be a mere evasion of the statute, which, as a remedial measure, should be liberally construed. Directly or indirectly, Bayonne gets its water from the Passaic river watershed and from the Ramapo as part of it; and so comes within the ruling in the Fagen case.

I concur in the result for the other reasons expressed in the opinion.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, TREN-CHARD, PARKER, BERGEN, KALISCH, KATZENBACH, WHITE, ACKERSON, VAN BUSKIRK, JJ.   10.