WESTINGHOUSE ELECTRIC CORPORATION, a corporation of the Commonwealth of Pennsylvania, complainant-respondent,

*v.*

UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, LOCAL No. 410, affiliated with the CONGRESS OF INDUSTRIAL ORGANIZATIONS, et al., defendants-appellants.

[Argued May 27th, 1946.   Decided December 5th, 1946.]

*Messrs. Rothbard, Harris & Oxfeld* (*Mr. Samuel L. Rothbard, Mr. Emil Oxfeld* and *Mr. Abraham L. Friedman,* of counsel), for the appellants.

*Messrs. Stryker, Tams & Horner* (*Mr. Walter F. Waldau* and *Mr. Edward N. Lippincott,* of counsel), for the respondent.

*Mr. Arthur Garfield Hays* (*Mr. Joseph Fishberg,* of the New Jersey bar, and *Mr. David I. Ashe,* of the New York bar, of counsel), for American Civil Liberties Union, *amicus curiæ.*

The opinion of the court was delivered by

PERSKIE, J.

This is a labor case. It is one of three cases in which the dispositive facts and applicable law were "so similar" that the three suits were tried together and were decided accordingly. See *Phelps Dodge, &c., Corp.* v. *United, &c., of America, 138 N. J. Eq. 3; 46 Atl. Rep. (2d) 453.*

The instant case presents for review the propriety of two restraining orders and the preliminary injunction which were issued against appellants in the face of our Anti-Injunction Act (*R. S. 2:29–77.1 et seq.*), during the progress of the labor

dispute, the strike which prevailed at the respondent's plant at Bloomfield, New Jersey.

Respondent's plant at Bloomfield consists of 11 buildings and contains about 1,000,000 square feet of floor space. Entrances to said plant are on MacArthur Avenue and Arlington Avenue. Respondent operates and maintains in this plant expensive and extremely intricate equipment and machinery used in the manufacture and engineering development of its products. It maintains and uses elaborate and critical services of various gases, including oxygen and hydrogen, which are distributed throughout the plant by an intricate system of pipes, in addition to power services of high voltage electricity, steam and compressed air. It manufactures incandescent, fluorescent, and miniature lamps and electronic tubes for use in industry, and radar equipment for the United States Army and Navy. It produces X-ray tubes for hospitals and other medical use as well as parts for lamps and for electronic tubes for other manufacturers and, in part, manufactures the machinery to make such products. Additionally, the plant is respondent's headquarters of its lamp division. Here all activities of that division, consisting of planning, manufacturing and sales, are co-ordinated for respondent's other plants in New Jersey and elsewhere.

Respondent employs about 4,800 persons at the Bloomfield plant. About 500 of the 4,800 are engaged in research work in the products manufactured by respondent.

Appellant United Electrical, Radio and Machine Workers of America, Local No. 410, affiliated with the Congress of Industrial Organizations (C. I. O.), is the exclusive collective bargaining representative of about 3,600 employees who are paid at an hourly rate. The headquarters of this local are at 4013 MacArthur Plaza, Bloomfield.

Appellant United Electrical, Radio and Machine Workers of America, Local No. 412, also affiliated with the C. I. O., is the exclusive bargaining representative of about 800 who are salaried employees. The headquarters of this local are at 27 Watsessing Avenue, Bloomfield.

Both locals, Nos. 410 and 412, hold their respective charters under the International Union, United Electrical, Radio

and Machine Workers of America (International Union) affiliated with the C. I. O.

There are about 350 employees who are not represented by either Local No. 410 or 412, or by the International Union. This group consists in part of supervisory employees, members of respondent's industrial relations department, secretaries and others doing confidential work for the respondent. This group is characterized as the "non-bargaining unit personnel;" it is not and has not been on strike.

Respondent holds a binding contract which it made on April 1st, 1944, in behalf of itself and its various subsidiary companies, with the International Union, including its locals, numbers 410 and 412, to the end of apparently "furthering desirable industrial relations" (*Cf. Hotel and R. E. Int. Alliance* v. *Wisconsin E. R. Board, 315 U. S. 437, 440; 86 L. Ed. 946, 950; Isolantite, Inc.,* v. *United Electrical, &c., of America, 132 N. J. Eq. 613, 618; 29 Atl. Rep. (2d) 183*). This contract was, by supplemental agreements (Supplement IV), made binding upon the parties for one year from April 1st, 1945; and it provides, in part, that "The Union agrees that neither it, its officers, nor its members, nor persons employed directly or indirectly by the Union will intimidate or coerce employees" (of respondent).

A dispute arose between the respondent and the appellants. The bone, marrow and sinew of that dispute was appellants' demand for a company-wide wage increase of $2 a day. All negotiations prior to and after the date (January 15th, 1946) fixed for the beginning of the strike, including those conducted by or with the aid of the mayor of the city, proved to be fruitless. With the beginning of the strike, appellants began to picket the entrances to respondent's premises. Appellants made it abundantly clear that they would not permit any person to enter respondent's premises except those who worked in the power house, its guards, its 13 managers who were the highest executives of the supervisory employees, and those of the "non-bargaining unit personnel," and those in charge of payrolls, some few others who rendered emergency repair services and who delivered fuel.

To the end of making their position effective appellants used many pickets and formed many picket lines. The pickets in each line numbered from about eight to 200 and the pickets were spaced about two feet apart. The lines formed varied from one to eight. When a non-striker sought to enter respondent's plant, the pickets would close up, form a loop, and walk up and down the sidewalk adjacent to the entrance, at a fairly fast pace. Thus one trying to push through such a line would either be carried along with the marching pickets from the entrance or would be forced out of line by the pickets. For further illustration the pickets, about 200 in number, would group in close formation at the main entrance to the plant and parade in eight lines in the form of a double loop, one line in the line of the curb and the other in the street adjacent to the plant, thus blocking entrances to the plant and obstructing those who walked on the sidewalks and in the streets.

Appellants unquestionably succeeded in their planned objective. They succeeded in preventing one of the highest managers from entering the plant. They succeeded in preventing all of the thirty of the "non-striking unit personnel" from entering the premises though they had appellants' permission to enter the same, and appellants refused to carry out their promise to admit the remaining number of this unit.

This, broadly stated, was the industrial relationship between the parties when on January 31st, 1946, respondent filed a bill in Chancery against appellants. By this bill respondent sought, among other things, relief from the number of pickets employed, from the manner in which the picketing was conducted, from the use of threats, force and intimidation, and from the concomitant resultant consequences flowing from appellants' action such as the blocking of the entrances to the premises and the sidewalks and streets leading to said entrances.

On the day the bill was filed, respondent was allowed a rule to show cause with restraints not here in issue. These restraints prohibited picketing to block entrances by power house employees and by those who replaced absentees. The rule to show cause was made returnable on February 13th,

1946. Appellants were given leave to apply to the court on February 5th, 1946, to modify the restraining order and respondent was also given leave, on two days' notice, to apply to the court for a preliminary injunction in accordance with the prayers of its bill.

Pursuant to the aforestated leave granted and upon notice and after due hearing, on February 6th, 1946, the learned Vice-Chancellor entered the order dated February 7th, 1946. This is the first order before us for review. Without detailing its provisions ((a) to (h)) it will suffice generally to state its substance. Appellants were restrained from picketing respondent's plant to prevent entrance to or exit from the plant by any person or vehicle whom the respondent was willing to have enter or leave its premises, from maintaining pickets or other persons, stationed or walking in front or in the immediate vicinity of respondent's plant, unless such pickets or persons were spaced ten feet apart, from assembling, crowding and massing pickets at any of its gates blocking the entrance to its premises, from committing acts of violence, making threats of personal violence to non-striking members, and from intimidating or coercing persons whom respondent was willing to have in and about its said plant, &c.

Thereafter respondent, again on notice and after hearing, obtained an order (February 11th, 1946) supplementing and making more effective the restraints granted under the order of February 7th, 1946. The provisions of this supplemental order (a) to (h) in substance restrained appellants from maintaining on the two streets, MacArthur Avenue and Plaza Place, more than 25 persons acting as pickets or aiding said pickets, and directing that said pickets and those aiding them be in a single line with no more than one single line on any one side of the street and that each picket or person aiding them be spaced at least ten feet in all directions from any and all other pickets, and further restraining appellants from maintaining in front of any entrance to respondent's plant on either side of Arlington Avenue more than five persons acting as pickets, or those aiding them, and directing that said pickets be in a single line on any one side of the street and that each picket or person aiding him should be at least ten

feet from any and all other pickets, and from assembling, massing, congregating or loitering at the Watsessing Avenue passenger station of the Lackawanna Railroad, or on Watsessing Avenue between a point 100 yards south of said railroad station and Bloomfield Avenue, or on Arlington Avenue between Watsessing Avenue and a point 200 yards east thereof, and from obstructing or physically interfering with free passage along any public sidewalk or street of any person desiring to enter or leave respondent's premises on foot or in vehicles. The remaining restraints followed those contained in the order of February 7th, 1946. The order of February 11th, 1946, is the second order before us for review.

Thereafter respondent was allowed, on notice and hearing, a preliminary injunction, under date of March 26th, 1946, which continued the restraints allowed in the supplemental order of February 11th, 1946. This order (March 26th, 1946) is the third order before us for review. Each of the orders sufficiently sets down or refers to the statutory finding of facts made by the Vice-Chancellor. *R. S. 2:29–77.3* and *R. S. 2:29–77.5*. The fact that such findings were made an integral part of each order as distinguished from having been made in a separate instrument, apart from each order, is in nowise fatal. The statute is silent as to the form in which the prescribed finding of fact should be made and filed.

Appellants challenge the propriety of the orders under review. In support of that challenge they set down and argue 15 points. The gravamen of that argument is that their actions were entirely proper and legal under our Anti-Injunction Act. *R. S. 2:29–77.1 et seq.* Acts of serious violence are not involved in this case. In short, we now have squarely before us for determination and decision the constitutionality *vel non* of *R. S. 2:29–77.1*. This · question, although briefly discussed, was left undetermined in the case of *Isolantite, Inc.,* v. *United, &c., of America, supra* (at *pp. 618, 619*), because the question was not properly raised in that case.

The learned Vice-Chancellor held that *sub-division (k)* of *R. S. 2:29–77.1* and *R. S. 2:29–77.1* were unconstitutional.

*Subdivision* (*k*) of *R. S. 2:29—77.1* reads as follows: "The aforesaid acts [(a) to (j) inclusive] are hereby declared, as a matter of public policy of the State of New Jersey, to be lawful and, in nowise to constitute a tort or a nuisance." The ground upon which that section was held to be unconstitutional was the undisputed fact that the title of the act failed to indicate that one of its objects was to make subdivisions (a) to (j) lawful and not to constitute them a tort or a nuisance, and, therefore, that section trenched upon article IV, section 7, paragraph 4 of our state constitution which provides, *inter alia,* that "every law shall embrace but one object, and that shall be expressed in the title."

The ground upon which *R. S. 2:29—77.1* was held to be unconstitutional was, tersely stated, that it was in excess of the legislative power to impair the jurisdiction of the court equity (article X, section 1 of our state constitution) when, as in the instant case, the proofs established the existence of the threatened existence of a wrong for which there was no adequate remedy at law. See *Phelps Dodge, &c., Corp.* v. *United, &c., of America, supra* (at *p. 10*).

Our determination of this cause leads us to the results that the learned Vice-Chancellor correctly advised the orders under review; that *subdivision* (*k*) of *R. S. 2:29—77.1* is no longer subject to the constitutional infirmity (defective title) which existed at the time the Vice-Chancellor construed the act; and that he erroneously declared that the entire section of *R. S. 2:29—77.1* unconstitutionally impaired the jurisdiction of our court of equity.

The furtherance of desirable industrial relations between the employer and employee is a sound principle of human relations. It is a principle that comprehends the property rights of the employer and the rights and dignity of the employee. It is a principle that not only affects the welfare of the employer and employee but also affects the social and economic welfare of the consumers, the public at large. It is a principle that does not remain static. It is a principle which must bend one way or another without breaking. It is a principle the application of which varies with the particular facts of each case under consideration. Thus legislation,

such as our Anti-Injunction Act, aimed as it is to further such a principle—the furthering of desirable industrial relations—must not lightly be disturbed by any one, especially not by the judicial branch of our government.

With these observations in mind we turn to an analysis of *subdivision (k) of R. S. 2:29–77.1.*

*First:* It declares that the permissive acts in subdivisions (a) to (j) inclusive, to be the public policy of the state. That is mere surplusage. Every act of our legislature necessarily bespeaks, under our form of government, the policy of the legislature—the state.

*Second:* It declares the permissive acts under subdivisions (a) to (j) inclusive, to be lawful. That, too, seems to us to be mere surplusage. The fact that the legislature prohibited the issuing of any restraining order, or a temporary or permanent injunction, necessarily impels the conclusion that the permissive acts (a) to (j) inclusive, were not illegal. And if those acts are not illegal, they cannot constitute an actionable tort or nuisance.

*Third:* But even if subdivision (k) were invalid, it is clearly severable from the other subdivisions. Subdivision (k) may therefore be prescinded from the act without adversely affecting the remaining subdivisions thereof, (a) to (j) inclusive. *R. S. 2:29–77.9* (severability clause).

*Fourth:* But even if it were assumed, our view to the contrary notwithstanding, that subdivision (k) may not be severed from the remaining provisions of which it is a part, the proofs establish that after the three orders under review were entered, and while the appeals from said orders were pending in this court, the legislature, on April 25th, 1946, amended the title to the act (*P. L. 1946·ch. 160 p. 723*) and cured the objection to the title relied upon by the Vice-Chancellor for the result reached by him.

Clearly the title to the act became free from its infirmity when it was amended on April 25th, 1946. *Cf. Patterson* v. *Close, 84 N. J. Law 319; 86 Atl. Rep. 430.* The question presented by the statutory change is whether we are obliged to dispose of the question as to the constitutionality of the title to the act according to the law prevailing at the time

the Vice-Chancellor entered his orders, or whether our determination should be made according to the law prevailing at the time of our disposition of the cause.

The authorities are not in accord. No case in our state directly in point is brought to our attention, nor have we been able to find such a case. *Cf. Myers* v. *Hollingsworth, 26 N. J. Law 186; Freeholders of Essex* v. *Freeholders of Union, 44 N. J. Law 438.* The greater weight of authority takes the view that the time of the determination of ‘the question by an appellate court governs, and not the law prevailing at the time the question was determined by the court below. (See *Annotations,* change of law after decision of lower court as affecting decisions on appeal or error, *111 A. L. R. 1317; general consideration (a), p. 1318 et seq.,* and cases there collated). Our federal courts clearly adhere to what is characterized as the greater weight of authority. In the case of *Carpenter* v. *Wabash Railway Co., 309 U. S. 23-30; 84 L. Ed. 558, 561,* Chief-Justice Hughes, who wrote the unanimous opinion for the court, followed the controlling rule as it was stated by Chief-Justice Marshall in *United States* v. *The Peggy, 1 Cranch (U. S.) 103, 110; 2 L. Ed. 49, 51,* and which reads as follows:

"It is in the general true that the province of an appellate court is only to inquire whether a judgment when rendered was erroneous or not. But if, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. * * * In such a case the court must decide according to the existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed in violation of law, the judgment must be set aside."

The stated rule is especially applicable in cases of injunctions because the right to an injunction is a right in future. Thus when as in the case at bar the question has been rendered moot by reason of the change of law, the right to an injunction will be disposed of according to the new law. *111 A. L. R. (c) 1328; Cf. Freeholders of Essex* v. *Freeholders of Union, supra.*

A rule of law which was pronounced in 1801 by Chief-Justice Marshall and followed by Chief-Justice Hughes in 1940, is one which well merits its adoption and perpetuation by this court.

We next turn to the question of the constitutionality *vel non* of *R. S. 2:29–77.1*.

As already observed, the learned Vice-Chancellor held that the jurisdiction of our Court of Chancery—successor to the Court of Chancery of England—comes into play when the proofs establish the existence or threatened existence of a wrong for which there is no adequate remedy at law. With that holding we are in accord. The learned Vice-Chancellor further held that the legislature by *R. S. 2:29–77.1* (characterized as section 1) impaired the stated jurisdiction of the court. With that holding we disagree.

It may well be, when our founding fathers continued the common law of England and so much of the statute law theretofore practiced in this Colony (*First Constitution of New Jersey, 1776*) and when thereafter it was ordained, *inter alia*, that "The several courts of law and equity * * * shall continue with the like powers and jurisdiction as if this constitution had not been adopted" (*1844 Constitution of New Jersey, article X, section 1*), that they did not visualize all of the varying circumstances which might thereafter form the basis for the invocation of the power and jurisdiction of our courts. Obviously, they were not interested in particular circumstances but were interested in fundamental principles. Thus they embraced those principles in the fundamental law of our state—our constitution. It is therefore not a good answer to say—as it is in effect said—that our founding fathers could not have had in mind that the jurisdiction of the Court of Chancery should embrace restraints and injunctive relief in labor disputes in 1844 since the Court of Chancery of England first granted injunctive relief in a labor dispute in 1868, and that such relief was not issued in our country until 1894. It is not a good answer because it begs the question. The test is not whether the Court of Chancery of England or our Court of Chancery had

exercised such relief prior to 1844 but rather is the test whether it had the power to exercise such relief.

Neither the "absence of precedents" nor the "novelty in incident" can operate to bar the exercise of the court's jurisdiction simply because in the process of changing times unforeseen circumstances and unforeseen wrongs are presented and for which there is no adequate remedy at law. *Cf. Federal Title, &c., Co.* v. *Lowenstein, 113 N. J. Eq. 200,* and cases collated on *p. 209; 166 Atl. Rep. 538.*

A wrong suffered without a remedy is a blot upon the sound administration of justice. In the dissenting words of Cardozo, C. J., in *Graf* v. *Hope Building Corp., 254 N. Y. 1; 171 N. E. Rep. 884, 888,* "* * * Let the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path. *Griswold.* v. *Hazard, 141 U. S. 260, 284; 11 S. Cl. 972, 999; 35 L. Ed. 678."* *Cf. Fifth Avenue Bank* v. *Compson, 113 N. J. Eq. 152, 153; 166 Atl. Rep. 86.* This is justice in action. This is giving meaning to the proper exercise of the jurisdiction of the Court of Chancery.

But, as observed, we do not share the view that *R. S. 2:29–77.1* impairs the jurisdiction of the court of equity. What has already been written as to *subdivision* (*k*) of *R. S. 2:29–77.1* is not, in principle, without application as to the constitutionality of *R. S. 2:29–77.1.* Additionally, it seems quite clear to us that the provisions (a) to (j) of *R. S. 2:29–77.1* when read singly or collectively impel the conclusion that they are but declaratory of the existing substantive law. In support of this conclusion, let us briefly refer to the existing law at the time of the enactment of *R. S. 2:29–77.1.* It provides that restraints or injunctions shall not issue to prohibit any person from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment." That is the fundamental law of our land prohibiting involuntary servitude and guaranteed in the Thirteenth Amendment to the United States Constitution.

"(b) Becoming or remaining a member of any labor organization or of an organization of employers, regardless of any undertaking or promise hereafter made." See *P. L. 1883 ch. 28; P. L. 1894 ch. 212,* and *P. L. 1932 ch. 244,* now *R. S. 34:12–1, 2, 3* and *5.*

"(c) Paying or giving to, or withholding from any person or persons any strike or unemployment benefits or insurance or other moneys or things of value."

"(d) By all lawful means aiding any person or persons in any labor dispute who is or are being proceeded against in, or is or are prosecuting, any action or suit in any court of this state."

These sections are but specific examples of the "natural and unalienable rights" guaranteed by article I, paragraph 1 of the New Jersey State Constitution. See, also, *Kingston Trap Rock Co.* v. *International, &c., 129 N. J. Eq. 570; 19 Atl. Rep. (2d) 661.*

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, picketing, without fraud or violence, or by any other method not involving fraud or violence, and not in violation of any other law of the State of New Jersey." See Fourteenth Amendment to the United States Constitution; *Thornhill* v. *Alabama, 310 U. S. 588; 84 L. Ed. 1093; Isolantite, Inc.,* v. *United Electrical, &c., of America, supra; Kerns* v. *Landgraf, 128 N. J. Eq. 441; 16 Atl. Rep. (2d) 623; 131 A. L. R. 1063.*

"(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute." This is the right of assembly, inherent in our constitutional guarantee in the Fourteenth Amendment to the United States Constitution and article I, paragraph 18 of the New Jersey constitution.

"(g) Advising or notifying persons of an intention to do any of the acts heretofore specified." Freedom of speech and press, too, is fundamental and will not be abridged. See article I, paragraph 5 of the New Jersey constitution.

"(h) Agreeing with other persons to do or not to do any

of the acts heretofore specified." Here again, the prior statute of 1926, now *R. S. 2:29–77* contained, in effect, the same provision. *Cf. Bayer* v. *Brotherhood of Painters, &c., 108 N. J. Eq. 257; 154 Atl. Rep. 759.*

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified regardless of any undertaking or promise hereafter made." This is the right of lawful communication. sanctioned in prior statutes, *P. L. 1883 ch. 28,* now *R. S. 34:12–1; P. L. 1894 ch. 212,* now *R. S. 34:12–2; P. L. 1926 ch. 207,* now *R. S. 2:29–77; P. L. 1932 ch. 244,* now *R. S. 34:12–5. Cf. Cameron* v. *International Alliance, &c., 118 N. J. Eq. 11; 176 Atl. Rep. 692; 97 A. L. R. 594.*

"(j) Requiring as a condition of employment that all employees of a particular employer or group of employers shall be members of a particular labor organization." This provision, alike for employee and employer, safeguards the basic freedom to contract. See *Kingston Trap Rock Co.* v. *International Union, &c., supra.*

"(k) The aforesaid acts are hereby declared, as a matter of public policy of the State of New Jersey, to be lawful and in nowise to constitute a tort or a nuisance." We have already stated our views as to this provision.

It is equally clear to us that what the legislature intended and aimed to accomplish was to protect and safeguard the employee against the prevailing procedure theretofore employed in obtaining and issuing restraints and injunctions. The legislature did so by stating what acts of the employee could not be restrained or enjoined—acts which he clearly had the right to commit, and what acts of the employee could be restrained and enjoined—acts which he was theretofore prohibited from committing, and it did so by regulating the procedure and limiting the scope and duration of the relief granted. To this end the legislature made it abundantly clear, *inter alia,* that the rights of the employee should not be invaded by the issuing of restraints and injunctions, on *ex parte* applications or on informal procedure. It subjected the issuing of restraints and injunctions to full, open and

formal procedure, and thus laid at rest the evils and abuses and hardships which the employee otherwise suffered. The legislature thus gave true meaning to due process, the *sine qua non* to a fair hearing.

Thus when the first colorable opportunity presented itself in the case of *Isolantite, Inc.,* v. *United, &c., of America, supra* (see *p. 609* and cases there collated), although the issue here discussed was not properly raised in that case, we took advantage of that opportunity and pointed out that in our opinion our "Anti-Injunction Act was not designed to impair, nor does it impair, the inherent power which our Court of Chancery has theretofore exercised, in a proper case, to issue restraints and injunctions," comparable to those which were issued in the *Isolantite Case*. And we further pointed out that our Anti-Injunction Act "was designed merely for the procedure which must be followed to obtain the injunctive relief and to limit the scope of the relief granted."

Our study of the case at bar in which the issue under discussion is raised and argued, although it may be moot since we were told on the argument of the case that the strike between the parties has been settled, leads us to adhere to our observations in the *Isolantite Case,* and, therefore, we hold that the provisions of *R. S. 2:29–77.1* (characterized as section 1 of our Anti-Injunction Act) are free from constitutional infirmity.

Finally we turn to the question of whether the restraints and injunctive relief under review are proper.

Our answer is in the affirmative. It is stoutly urged for appellants that since the picketing employed by them was free from acts of violence, the restraints and injunctive relief granted trenched upon their constitutional right of free speech and assembly under the Fourteenth Amendment to our federal constitution. *Cf. Thornhill* v. *Alabama, supra; Carlson* v. *California, 310 U. S. 106; 84 L. Ed. 1104; Cafeteria Employees Union* v. *Angelos, 320 U. S. 293; 88 L. Ed. 58.* The argument is not sound. It fails to recognize factors other than violence which operate to bar the workingman's

qualified right to picket as a means of communication. Such other factors, for example, are that the picketing must be peaceful; that it must be free from intimidation, coercion, duress, fraud, and force; that it must, under the Anti-Injunction Act of our state, be, among other things, "not in violation of any other law of this State." *R. S. 2 :29–77.1* (*e*). (For a fuller discussion of the subject and the cases in support thereof, see *Isolantite, Inc.,* v. *United, &c., of America, supra,* at *pp. 620 et seq.*)

The epitomized statement of the facts, plus the photographic and other exhibits, establish to our satisfaction that appellants did not use the stated number of pickets and the number of picket lines, however labeled, as a means merely to communicate the existence of a strike but rather as a highly coercive measure. That this was so was frankly admitted on the argument of the cause. In such circumstances, Professor Edward S. Corwin, *56 Harvard Law Review 486,* says : "\* \* \* In many circumstances picketing, even when unaccompanied by actual violence or fraud, is coercive and intended so to be ; and when it is, it is related to freedom of speech to about the same extent and in the same sense as the right to tote a gun relates to the right to move from place to place." See *Teller, "Picketing and Free Speech" (1942), 56 Harvard Law Review 180; Dodd, "Picketing and Free Speech, A Dissent," op. cit. supra, p. 513,* and note on *"Picketing and Free Speech Since the Ritter's Cafe Decision," 59 Harvard Law Review 1123.* And in the words of Chief-Justice Maxey, in the case of *Carnegie-Illinois Steel Corp.* v. *United Steel Workers, 353 Pa. 420; 45 Atl. Rep. (2d) 857, 861,* "Collective coercion is not a legitimate child of collective bargaining."

The same proofs which establish the highly coercive conduct also established that appellants otherwise violated the laws of this state (*R. S. 2 :29–77.1(e)*). From the very day the strike began until it was settled, appellants' method of picketing was tantamount to the erection of a fence—barring entrance to respondent's plant. The fence was made up of human bodies and it operated to give to appellants the control over who should and who should not enter respondent's

plant. Appellants exercised that control most effectively. They acted as if they and not respondent were the owners. of the plant. But a picket fence is not the legitimate child of a picket line. *Cf. Carnegie-Illinois Steel Corp.* v. *United Steel Workers, supra.* Even the few men who were permitted to enter the plant did so on appellants' written permission but frequently not without considerable difficulty and at times were not able to enter the plant. Thus respondent was clearly deprived of the primary attributes of the ownership of property, namely, the uses thereof. Such uses necessarily embrace the right of free access to respondent's plant by the owners thereof and their employees and customers who wish to enter same. To the extent that such free access was denied, appellants' action was tantamount to a seizure of respondent's property. Such action is beyond judicial sanction. Equity alone can provide the adequate remedy.

We need hardly labor the point that appellants' action with its concomitant attributes of blocking the sidewalks and the streets leading to and abutting respondent's plant are also clearly in violation of the laws of the state and are, therefore, not immune from restraint and injunctive relief. *R. S. 2:29–77.1(e).* Compare, recent case in Pennsylvania where its Anti-Injunction Act specifically exempts the seizure of property from the inhibition against the issuing of restraints and injunctions in labor disputes. *Carnegie-Illinois Steel Corp.* v. *United Steel Workers, supra; Westinghouse Electric Corp.* v. *United E. R. M. Workers, 353 Pa. 150; 46 Atl. Rep. (2d)* 16.

The close proximity of the headquarters of the respective local unions, of the Watsessing Avenue passenger station of the Lackawanna Railroad, of Watsessing Avenue, of MacArthur Avenue and Arlington Avenue, and of the other streets involved, to respondent's plant, as well as the number of pickets, the number of picket lines, the illegal blocking of the sidewalks and the stated streets by the pickets, their aiders and supporters, fully support the limited scope of the restraints and injunctive relief granted. Such restraints and injunctive relief, we hold, are fair, equitable and just.

114

We have considered all other points argued and find them to be without merit.

For the reasons here stated and for those stated· by the learned Vice-Chancellor not inconsistent herewith, the orders under review are affirmed. No costs are allowed to either party. *Moore* v. *Splitdorf Electric Co., 114 N. J. Eq. 358; 168 Atl. Rep. 741.*

*For affirmance*—THE CHANCELLOR, PARKER, BODINE, DONGES, HEHER, PERSKIE, WELLS, RAFFERTY, FREUND, McGEEHAN, McLEAN, JJ. 11.

*For reversal*—None.