131 N.J. Super. 300 (1974)
329 A.2d 585
STATE OF NEW JERSEY AND BOARD OF PUBLIC UTILITY COMMISSIONERS, PLAINTIFFS,
v.
EAST SHORES, INC., MRS.E. CONDIT, ROBERT CHEW, JOSEPH WODZIAK, J. ATKINSON, JOSEPHINE BENEDICT, SOUTH ORANGE FEDERAL SAVINGS BANK, A NEW JERSEY CORPORATION, JAMES TIBUS AND WILLIAM DONZIESER, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 10, 1974.
*302 Mr. William F. Hyland, Attorney General, attorney for the plaintiff (Mr. Joseph W. Ferraro, Jr., Deputy Attorney General, of counsel and on the brief).
Mr. Milford Salny for defendant East Shores, Inc. (Messrs. Salny and Redbord, attorneys).
Mr. Frederic C. Ritger, Jr., attorney for defendants Josephine Benedict, Yorkwood Savings & Loan Assn and Liberty Federal Savings & Loan Assn.
Mr. William Donzeiser, III attorney, appearing pro se and for defendant Class of Seasonal Users Without Lakefront Property.
Mrs. E. Condit appearing pro se and as representative of Class of All Year-Round Residents.
Mrs. Joseph Wodziak appearing pro se.
MUIR, J.S.C.
The essential proposition presented in this action by amended complaint after appointment of a custodial receiver for the water utility of defendant corporation is whether this court should transfer title to certain corporate assets to the receiver, presently outside his control, *303 for liquidation to provide funds for improvements to the utility to implement a presently unsatisfied Board of Public Utility Commission (PUC) order.
PUC ordered defendant East Shores, Inc. (East Shores) on November 14, 1971, after determining it to be a public utility within its jurisdiction, to provide potable water to its customers and to institute an engineering study to ascertain what work was required to render "safe, adequate, and proper water service," and then, after PUC approval, to proceed and complete such work. The failure of East Shores to comply precipitated this action, which initially constituted an order to specifically perform the PUC order and ultimately resulted on July 12, 1972 in Edward Saputa, president and principal stockholder of East Shores, signing a consent order appointing John H. Dorsey as receiver "to take charge of the property relating to the water operations [to] complete the required construction as ordered by the Public Utilities Commission * * * until the Court is satisfied that the public is receiving potable water and being provided with safe, adequate and proper service * * * thereafter [with] approval by the court, to return the said assets of the company to the Defendant."
The consent order also provided, that defendant, through its president, was to continue operating the utility under the receiver's supervision, and upon failure to do so the receiver or the PUC "shall make application * * * for [a] receivership of all the assets of Defendant Corporation * * *." East Shores was restrained from divesting itself of its nonwater utility-related assets.
Upon the failure of East Shores to continue operation of the water utility and due to the absence of funds to undertake an engineering study, the State applied to amend its complaint to have the other assets of East Shores, consisting essentially of vacant real estate, turned over to the receiver to be sold, with the proceeds being utilized for improvements to the water utility. The application resulted in the inclusion of additional defendants under R. 4:32, necessitated by *304 the facts that certain lands of East Shores are burdened with deed-covenanted rights of adjoining landowners for recreation and related uses and the refusal of certain landowners to pay the receiver a PUC-established tariff for water use which exceeded deed-covenanted amounts.
The facts are essentially uncontroverted. East Shores, under the aegis of Julius Benedict, its principal stockholder, commenced in the 1940s a subdivision of substantial lands located on the east shore of Lake Hopatcong. A map was prepared, with at least one section being filed in the Morris County Clerk's Office, and lots were then sold using, in most instances, the map as a reference. The deeds of conveyance contained the following covenant:
The [grantee(s)] shall automatically become menber [sic] of the Community Club, which shall entitle [them] to the uses and privileges pertinent thereto, said privileges are as follows: Use of the Club House as and when built, beaches, docks, roads, rights of ways to shore front and beach, water for drinking and household use, provided however that the [grantee(s)] shall pay to [East Shores], its successors and assigns, the sum of [various amounts set forth] for the privilege of tapping the water line and a charge yearly, payable on or before the first day of June of each year for community dues. It is understood and agreed that the membership and all privileges pertinent thereto, shall terminate upon change of ownership of the above mentioned premises or upon failure to pay community dues when due.
Some deeds contained the additional provisions:
Community dues not to exceed $50.00 [sic] yearly. The [grantees] as members of the Community Club have the exclusive use of the water front in front of [their] lot for the purpose of bathing, boating and recreation, also have the privilege of erecting a solid boat dock not to extend more than 15 feet into the waters of the Lake in front of their lot, 8 feet from the side line. If [grantees] sell to person or persons acceptable to the Community or to [East Shores] in that event transfer of Community privileges will be made by East Shores, Inc. its successors and assigns.
Each deed contained a provision that East Shores, "its successors and assigns reserved a right and easement to contruct, *305 lay and maintain water pipes and control water supply therein on, under and across the premises conveyed."
The map of the East Shores subdivision designated beach areas with docks and proposed docks, as well as strips of land called "reserve" that are rights of ways to the beach areas from roadways. It also showed a parcel of land to be used for a clubhouse which has never been built.
As the lots were sold off the water supply system developed. Initially, water was supplied from two wells that were interconnected. The wells were abandoned in 1958 due to high iron content and lack of yield, and infiltration beds were installed in Lake Hopatcong. A pumping, treatment and storage system, later discussed, was also installed. The distribution mains and lines were installed across various lots. None was installed in street beds except where crossing from one section of the development to the other was required.
During the 1950s and early 1960s there are no recorded problems with the water system. In 1964 Julius Benedict's widow sold the entire stock of East Shores to Edward Saputa. As part of the transaction a mortgage was given to Josephine Benedict by East Shores in the amount of $36,384.35. The amount, priority and security of that lien are not in issue at this time.
By the late 1960s East Shores had approximately 260 water customers. (Records of the receiver presently show 284 household connections.) Some of the customers were year-round residents while others were just summer residents.
Subsequent to the change in ownership of East Shores problems arose with the quality and distribution of the water. In 1966 the State Board of Health found polluted, contaminated water being distributed by East Shores and ordered improvements made and the "ceasing of distribution of polluted water by July 1, 1966." East Shores failed to make adequate improvements, leading to a hearing before the PUC and the subsequent order of November 4, 1971.
At the time of the receiver's appointment there was a local board of health order for customers to boil water before use. *306 The proofs did not indicate clearly whether this order is still in effect but the receiver indicated chlorination makes the water potable now.
From the outset the receiver experienced financial difficulties. Money had to be borrowed to pay the back salary of the state-licensed operator of the system. Some customers did not pay their annual dues. The receiver applied to and received from the PUC the authority to charge $100 a year to year-round customers and $45 for summer customers. He is still experiencing collection difficulties and has a substantial number of complaints pending in the Morris County District Court awaiting the outcome of this action. With the funds he borrowed and collected he has been able to maintain the system but does not have sufficient funds to hire an engineer to commence a study as required by the PUC order. He testified it costs about $1,000 a month to maintain and operate the system, without consideration being given to major repairs or renovations. An interim accounting filed with the court shows an on-hand balance of approximately $5,600 which the receiver says is less than is required just to meet the maintenance and operating costs. He testified that emergent problems, such as broken water lines that result from the antiquated nature of the system (as found by the PUC in November 1971), cannot adequately be handled with the present income.
It is parenthetically noted that efforts were made through negotiations to have the water system taken over by Jefferson Township, but this was defeated at a public referendum.
Defendant did not, under the receiver's supervision, operate the system as the court's July 12, 1972 order provided, but the receiver carried on the operation alone.
The general description of the system was offered through testimony of a Department of Environmental Protection (DEP) representative, the licensed water operator of the East Shores system, the receiver and an engineer experienced in the design and construction of water supply and distribution systems, who surveyed it. The combined testimony *307 described a system with inadequate treatment facilities, inadequate pumping facilities, inadequate storage facilities, and an inadequate distribution system essentially due to the age and undersized capacity and lack of maintenance and upkeep. The "Topsylike" growth of the utility and absence of any substantive records on the location of distribution lines also contribute to the inadequacies. (A map showing distribution lines was marked into evidence but it lacks any reliable engineering information.)
The engineer, utilizing company records, indicated that the sytem supplied approximately 1100 people; the average annual daily water production is 150,000 gallons a day, with summer-month daily production being 230,000 gallons. Relying upon the potable Water Standards and the Rules and Regulations for the Approval of Public Water Supply Systems and Water Treatment Plants of DEP, the engineer estimated the cost of improvements required to meet the PUC order would be $433,000. The breakdown of the total figure is:

 (a) Treatment $ 80,000
 (b) Pumping equipment 16,250
 (c) Distribution system 141,750
 (d) Storage 89,500

with the remainder for contingency, legal and engineering expenses. He testified the work could be done in phases, with treatment, pumping and storage being done immediately and the distribution system left to a capital improvement plan over a number of years. The figures presented were noted to be subject to inflation.
The tax assessor of Jefferson Township testified on the value of all the land owned by East Shores. He indicated that as of the most recent township-wide revaluation by a professional revaluation firm, which was completed in 1973 and went into effect on January 1, 1974, the total value of all East Shores lands is $315,400. This land includes beach front, submerged land, separate lots that do not conform to *308 local zoning standards, acreage parcels and lands devoted to water utility purposes. If the water utility lands and recreationally-devoted lands are excluded, the total assessed value is $280,700. This figure represents the price, as determined by the revaluation study, the lands would sell for at a fair and bona fide sale by private contract. N.J.S.A. 54:4-23. It indicates the market value of the lands in their present condition. In re Appeal of East Orange, 80 N.J. Super. 219, 231 (App. Div. 1963).
The specific issues to be resolved by the court are:
1. The authority of the court to transfer nonwater utility related assets of East Shores to the receiver for liquidation, to provide funds for the purpose of working toward compliance with the PUC order;
2. Whether the receiver, if the lands are transferred to him for sale, can sell the dedicated lands free and clear of the rights of the East Shores' grantees or their successors in title;
3. Whether the deed covenants to supply water and recreational facilities for a prescribed dollar amount are enforceable by the property owners;
4. Whether the matter should be remanded to the PUC to consider modification of its order for reconsideration since the value of the assets proposed for transfer fall short of the funds necessary to comply with the order.
It is the opinion of the court, for reasons hereafter stated, that
(1) all the remaining assets of the corporation be turned over to the receiver for liquidation except those lands encumbered by rights of East Shores' grantees and their successors in title, which shall be turned over and held as hereinafter set forth;
(2) the receiver is authorized to sell, subject to court approval, the unencumbered lands free and clear of all liens, paying only the outstanding taxes (the validity and amount of the Benedict mortgage to be determined at a subsequent proceeding);
(3) the receiver shall make application to the PUC for such modification of its order as is required to allow him the time needed to improve the water supply and distribution *309 system of East Shores or such other alternative relief the PUC shall determine;
(4) the receiver shall collect and the water users are directed to pay the charges established by the PUC for water use;
(5) the receiver shall continue to operate and maintain the water supply and distribution system of East Shores in the manner prescribed by the July 12, 1972 order of this court, and shall further maintain, operate and manage the recreational facilities of the East Shores Company, with full power to sue for, collect and receive revenues, borrow funds and do all things required in the proper management of the facilities, including setting a reasonable annual user's fee in accordance with the guidelines hereinafter set forth, and the users shall pay such fees or be subject to loss of privilege to use the facilities as set out in the deed covenants;
(6) upon compliance with the PUC order or such modified order as it may issue, with court approval and on notice to all parties, the receiver may return the assets of the company to defendant East Shores.
N.J.S.A. 48:2-41 enhances the PUC with the authority to move in a court of equity for specific performance of its orders. It does not anticipate noncompliance after a court's direction to the utility to perform. It makes no provision for appointment of a receiver to assure compliance. The receivership created by this court in July 1972 dealt with the failure to comply. It is a receivership custodial in nature and based upon inherent equity jurisdiction without reference to any statutory authority. The power of a custodial receiver is in sharp contrast to that of his statutory counterpart. The latter is appointed to protect shareholders and creditors on specific ground such as insolvency, and acquires legal title to corporate assets with the power to liquidate the assets and dissolve the corporation. N.J.S.A. 14A:14-2, 4, 5. A custodial receiver is appointed to preserve the corporate assets for a prescribed period, usually pending the litigation, *310 and acquires no legal title and is devoid of the power to liquidate and dissolve. Query: Can the custodial receiver here be vested with legal title? There are reasons why he can and should be:
First: The object of transferring title is to ultimately provide funds to rehabilitate the water system. In so doing, he is in effect preserving an essential corporate asset which is consonant with the historical aims of appointing a custodial receiver.
Second: East Shores began as a single entity with a single purpose  the sale of lands. As part of the sales program, the providing of water became a sales feature. In reliance East Shores' grantees purchased lands and built homes, many for year-round use, and are now confronted by a situation, if this court cannot grant relief, of being without a water supply essential to their daily health and welfare. The water operation was inextricably involved with all the corporate assets and should remain so.
The slavish adherence to a legal precedent that denies a custodial receiver legal title to corporate assets would be manifestly unjust. Equity does not have to be bound to precedent under these circumstances. As Justice Heher indicated in Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403 (E. & A. 1938):
Equitable remedies "are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it to fit the changing circumstances of every case and the complex relations of all the parties." Pom. Eq. Jur. § 109. [at 411]
Third: While we are not dealing with a statutory receiver, it is noteworthy that one can be appointed when a corporation is insolvent. N.J.S.A. 14A:14-2. The testimony of the receiver here indicates he has inadequate capital to comply with the order of the PUC. The remaining land *311 of the corporation could not be mortgaged or otherwise hypothecated to raise sufficient capital since its total value is substantially less than needed to comply with the PUC order. A corporation is insolvent when the aggregate of its property is not, at a fair valuation, sufficient to pay its debts or when it is unable to pay its debts by the honest use of credit. N.J.S.A. 14A:14-1(f). An equitable debt of East Shores here is its obligation to provide a safe, adequate potable water supply to its users. It is unable to do so under existing circumstances. It is, therefore, equitably insolvent. The corporation cannot be liquidated. The alternative is to sell the remaining assets, with ultimate aim toward total rehabilitation of the water system. This is the equitable remedy that fits the circumstances.
Fourth: The consent order anticipated this transfer. Defendant has not operated the water company, but left it to the receiver. It cannot now complain.
The extent of the land of East Shores transferred to the receiver for liquidation must be limited to lands free and clear of the rights held by East Shores' grantees. East Shores made conveyances containing covenants providing the grantees, upon the condition they pay the annual community dues, with the use of beaches, docks, roads and rights of ways to shore and beach. The conveyances were made with reference, in most instances, to the map of the East Shores subdivision. The conveyance of lots by reference to a map upon which streets, rights of way, beaches and docks are laid out impliedly creates private rights in those streets, rights of way, beaches and docks shown. See Clark v. Elizabeth, 40 N.J.L. 172, 174 (E. & A. 1878); State v. Birch, 115 N.J. Super. 457, 464 (App. Div. 1971); Cunningham and Tischler, "Dedication of Land in New Jersey," 15 Rutgers L. Rev. 377, 404 (1961). Once these rights are created, they cannot be destroyed unless just compensation is paid. See 15 Rutgers L. Rev. at 405; Mueller v. N.J. Highway Authority, 59 N.J. Super. 583, 589 (App. Div. 1960). The receiver is in no position to buy out the rights. The sale of the lands burdened *312 with these rights, when considering their limited value, is not reasonable at this time.
The private rights are, it is recognized, subject to being extinguished under the deed covenants for nonpayment of community dues or transfer of title. There is no proof before the court sufficient to justify a determination that the rights can be extinguished, and even in the event several property owners could have their rights extinguished, those of the remaining owners would continue. It is noted, however, that the clubhouse was never constructed and therefore no rights established in the land assigned on the map for the clubhouse. It can be sold by the receiver, as can submerged lands, but only to those who have rights therein.
The original deeds combined the cost for water and recreational use as one amount. The water use rate is now established. A determination of the charge for other services must be made. Again, the amounts of $50 set forth in most deeds may be unrealistic in light of present-day inflation and the cost of operating such facilities. The parties to the deeds at the time of original conveyances believed the $50 amount adequate to cover the named services  apparently in perpetuity. This was a mutually mistaken belief that required a reformation or modification to meet present-day standards. Under present-day standards, the fee set may not be reasonable. An analysis of costs and expenses will have to be made to decide what a reasonable fee is. The fee will have to bear a reasonable relationship to the costs incurred. The receiver is directed to ascertain all maintenance, operating and related expenses and the need for capital improvements, and then to set a fee that will render the recreational facilities self-sustaining.
Defendant East Shores suggests the matter be remanded to PUC without court action because the funds which the sale of land will produce are inadequate to rehabilitate the water system in accordance with the November 1971 order. Initially it must be said that immediate efforts to comply in 1971 might have avoided this inadequacy. The suggestion, however, *313 flies in the face of reason. Since 1966 the water system customers have been confronted with a faulty, defective supply and distribution system. A partial resolution is at hand and the court cannot turn its back. Clearly, some modification of the order is necessary, but this can be done with PUC in full command of all the facts and this Court's determination and after the receiver has determined the funds available.