154 N.J. Super. 57 (1977)
380 A.2d 1168
STATE OF NEW JERSEY AND BOARD OF PUBLIC UTILITY COMMISSIONERS, PLAINTIFFS,
v.
EAST SHORES, INC., DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 25, 1977.
*58 Ms. Blossom A. Peretz, Deputy Attorney General for Dept. of Energy Board of Public Utilities.
*59 Mr. Barry H. Evenchick, for East Shores Residents.
Mr. Joel A. Murphy, for Township of Jefferson (Messrs. Mills, Hock & Murphy, attorneys).
Mr. John H. Dorsey, Receiver.
Frederic C. Ritger, for mortgagees, as a class.
POLOW, J.S.C.
The fundamental question which must be resolved by this court is one of first impression in this State and concerns, simply, whether the court possesses authority to compel the Township of Jefferson to take over and operate a local water utility, presently in custodial receivership, unless the municipality can otherwise arrange to supply its residents who are customers of the said water company with an adequate, potable water supply.
During the 1940s defendant East Shores, Inc. began to develop and sell lots along Lake Hopatcong. Deeds to lots sold contained a covenant requiring East Shores to provide water "for drinking and household use" for a $50 monthly charge. However, during the 1960s East Shores' water system deteriorated seriously, and on July 27, 1970 the Board of Public Utility Commissioners (PUC) issued an order requiring boiling of all drinking water supplied by East Shores. On November 14, 1971 the PUC declared East Shores a public utility and ordered it to upgrade its water distribution system so as to be capable of distributing an adequate supply of potable water.
East Shores failure to comply with the PUC order precipitated this action which initially resulted in an order seeking to compel compliance with PUC requirements and ultimately, on July 12, 1972, led to the appointment of John H. Dorsey as receiver to operate the company and "to complete the required construction as ordered by the PUC * * * until the court is satisfied the public is receiving potable *60 water and being provided with safe, adequate and proper service * * *." The receiver appointed at that time is still, more than five years later, operating the water company. However, despite his best efforts at collection of customers' obligations and more efficient operation, the receiver experienced financial difficulties from the outset. He has had substantial collection problems and was forced to institute numerous county district court complaints to enforce payment by unhappy water customers. With the funds he collected and some loans, he was able to maintain the system and upgrade the quality somewhat by chlorination. However, he lacked sufficient funds to retain an engineering consultant to commence the study demanded by the PUC. Hence, by order of this court the receiver was permitted to sell certain lands of East Shores in October 1974, State v. East Shores, Inc., 131 N.J. Super. 300 (Ch. Div. 1974), and an engineering study was procured with the proceeds realized from the sale.
Cost estimates for necessary improvements to the system have increased over the years. The pretrial order of March 1, 1976 asserts that necessary improvements would cost $600,000 to $850,000 but that proceeds at that time were inadequate to maintain even day-to-day operations. Although a rate increase has since been approved by the PUC, operating proceeds still fall short of day-to-day needs.
A state engineering report as well as a study obtained by the municipality itself suggest the possibility of interconnecting East Shores' system with other nearby water systems. Jefferson Township presently owns and operates two small water systems, neither of which is adjacent to East Shores. Efforts by the township to take any steps toward municipal operation of East Shores have been discouraged by the fact that on two occasions the issue has been the subject of referendum, and on each occasion the voters have responded negatively. Hence, the township has done nothing and has, in fact, refused to consider any financial commitment necessary to obtain federal assistance for a feasibility *61 study and discouraged efforts by the Morris County Municipal Utilities Authority to consider its own involvement. The attitude of the municipal governing body, in a nutshell, is one of sympathy for the residents of East Shores, but since the voters refused to approve municipal takeover of the water system, their official position is that the problem is one which the East Shores residents themselves must solve. Recent attempts by different parties to this suit to obtain municipal cooperation or even consideration of the problem have been summarily rejected by the governing body.
Originally, most of the residences in the East Shores development were of a seasonal nature, occupied only during the summer months. Houses were built on narrow lots containing individual septic systems and, according to the local health authorities, are not appropriate for drilling of wells to supply individual water needs. Through the years many of the properties have been built for or converted to year round residences, involving the usual municipal approvals including building permits, board of health approvals, certificates of occupancy and the like. During the course of this litigation, all construction within the East Shores community and any expansion of water use have been enjoined. However, the damage had been done during the previous decade. Lack of foresight and little concern for the consequences have taken their toll.
This court has already found that the system suffers from inadequate treatment facilities, inadequate pumping facilities, inadequate storage facilities and an inadequate distribution system. This is the result of age, undersized capacity, lack of planning, as well as poor maintenance and upkeep. East Shores has not participated in these proceedings through counsel in recent years although an individual claiming to be a principal has appeared from time to time at court hearings. During the past year the court has appointed counsel to represent the customers of the water company. In addition to the receiver and counsel for the residents, the other active participants in the many hearings conducted by the *62 court have been the municipality, the PUC and, from time to time, counsel for parties holding mortgages on East Shores property.
The township has failed to present or suggest any viable alternatives to this court and, in fact, denies any obligation to do so. Counsel for the township has been unable to deny that the receivership cannot be continued indefinitely; that even if it were continued, there would be no possibility of making the necessary improvements; that if the receivership is terminated, the water supply would be shut off. Consequently, the municipality would have 285 residences without water because it has already authorized individual septic systems and has already determined the land unsuitable for separate wells. Continuation of the receivership is no longer in the public interest. There is no way possible for the receiver to provide necessary improvements and continued operation of the antiquated, dilapidated system is an invitation to disaster. It is clear that no private interests are willing to take over its operation; that East Shores, as an entity, is no longer operational; that the property owners cannot reasonably be expected to accept the responsibility, and that the municipality refuses to act and has relied on the receivership to solve the problem. Hence, this court gave notice that as of January 1, 1978 the receiver will be required to terminate his responsibility for operating the water company and will wind down his operation in as orderly a manner as possible. May this court now order Jefferson Township to assume the obligation from the receiver or to arrange a suitable alternative?
I am satisfied that the Township of Jefferson possesses the inherent police power to provide East Shores customers with water. Police power of a public body is the most essential and least limitable power of government in that it coincides with the need and welfare of the public. Katobimar Realty Co. v. Webster, 20 N.J. 114, 123 (1955); Jamouneau v. Harner, 16 N.J. 500, 514 (1954) cert. den., 349 U.S. 904, 75 S.Ct. 580, 99 L.Ed.2d 1241 (1955); *63 Schmidt v. Newark Bd. of Adj., 9 N.J. 405, 414 (1952); N.J. Good Humor, Inc., v. Bradley Beach, 124 N.J.L. 162, 169 (1940), and 6 McQuillin, Municipal Corporations (3 ed. 1969), § 24.04 at 473. To say that the East Shores' customers face a serious need which threatens their welfare is to understate the obvious. Quite simply, if a remedy to this problem is not found, their homes will become uninhabitable.
The State Legislature, by virtue of N.J.S.A. 40:48-1, has set forth 30 general regulatory police powers to be exercised by municipalities. These grants are further supplemented by the catchall provision of N.J.S.A. 40:48-2:
Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules, and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.
Should there still be doubt as to Jefferson's authority to act in this matter, N.J.S.A. 40:62-47 grants to municipalities the power to do all "acts necessary to provide water for the public and private uses of the municipality and its inhabitants" pursuant to more specific grants detailed in N.J.S.A. 40:62-48 through 40:62-151.
Having found that the Township of Jefferson possesses the power to act, the question narrows to whether there is here a duty to act. Again, I must resolve this question in the affirmative. Not only have municipalities been provided all of the necessary tools, but the Legislature has encouraged their exercise by declaring the public policy of this State as promoting "by all reasonable means the provision and distribution of an adequate supply of water for the public and private uses of counties and municipalities and their inhabitants * * *." N.J.S.A. 40:14B-2. Nevertheless, all parties to this action concur that there is no precedent *64 wherein this particular issue has been determined. Such absence is, in itself, not determinative of the issue. A court of equity will not be foreclosed from acting by lack of precedents nor by uniqueness of the problem, especially when there is no reasonable alternative remedy. Cooper v. Nutley Sun Printing Co., Inc., 36 N.J. 189, 198 (1961), and Westinghouse Electric Co. v. United Electrical, &c., 139 N.J. Eq. 97 (E. & A. 1976). Indeed, as noted in Westinghouse, supra at 108, quoting from then Judge Cordozo, "Let the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path."
Thus, the hardship already suffered by East Shores' customers might in itself be considered as sufficient grounds for compelling Jefferson to act. In fact, New Jersey's courts have often recognized a duty on the part of municipalities to exercise their police powers. Perhaps the most notable of these is State v. North Jersey Dist. Water Supply Comm'n, 127 N.J. Super. 251 (App. Div. 1974) cert. den., Passaic Valley Water Comm. v. New Jersey ex rel. Dept. of Health, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974), affirming a mandatory injunction compelling two unwilling entities, a municipality and the water commission, to participate in the improvement and building of a water treatment plant. The municipality there, too, argued that there was an absence of statutory or contractual authority to compel such participation. The court rejected this argument by viewing the matter "in the perspective of the state's overriding concern and obligation to safeguard the public health." Id. at 260.
The foregoing is not an isolated instance. Our courts have in other cases found a duty to exercise police powers. Regarding the attainment of adequate water supplies, the court in Bayonne v. North Jersey, etc., Comm'n, 30 N.J. Super. 409, 416 (App. Div. 1954), stated that a "municipality has a duty to provide for its future * * *."
*65 In Jones v. Haridor Realty Corp., 37 N.J. 384, 393 (1962), which dealt with an alleged violation of the law against discrimination, the Supreme Court noted that
One of the basic functions of government is to safeguard the health, safety and welfare of its people. Upon the appearance of conditions detrimental to their welfare, it has the duty to apply remedial measures.
In a labor dispute concerning the regulation of public utilities, the Supreme Court observed that
* * * the State has not only the right but a pressing duty to step in and prevent the continuance of such stoppage or impairment and to take appropriate measures to restore them. If instead of a stoppage or curtailment of essential services there is an imminent danger of their being halted or curtailed, the State has the right as well as the obligation of preventing the occurrence of any such catastrophe, Cf. United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). [Van Riper v. Traffic Tel. Workers' Fed. of N.J., 2 N.J. 335, 346 (1949)]
In a dispute regarding extension of an existing water main the Supreme Court, in Reid Development Corp. v. Parsippany-Troy Hills Tp., 10 N.J. 229 (1952) held that the municipality
* * * is under a duty as a public utility to supply water to all inhabitants of the community who apply for the service and tender the usual rates. The obligation includes the establishment of a distributive plant adequate to serve the needs of the municipality and the enlargement of the system to meet the reasonable demands of the growing community. The utility is under a duty to serve all within the area who comply with fair and just rules and regulations applicable to all alike. The obligation is enforceable by mandamus. Bordentown v. Anderson, 81 N.J.L. 434 (E. & A. 1911); Woodruff v. East Orange, 71 N.J. Eq. 419 (Ch. 1906); Millville Improvement Co. v. Millville Water Co., cited supra.
And in Mongiello v. Hightstown, 17 N.J. 611 (1955), the Supreme Court reiterated the duty of a municipality to extend existing water mains to all within its borders. The *66 court noted, however, (at 616), that this duty would be negated by a showing that "the cost to the community would be grossly disproportionate to the individual needs presented."
Under the facts of this case, I can only conclude that there is a duty on the part of Jefferson Township to supply the East Shores customers with water, and that the cost of meeting this duty is not "grossly disproportionate to the needs presented." Indeed, the obvious necessity of the instant circumstance, coupled with the clear grant of power to remedy such a need, the explicit state policy in favor of exercising this power coupled with the duty to exercise such powers under such conditions, without more would alone justify such a ruling by a court of equity. However, this case is even more compelling.
The Township of Jefferson cannot be viewed as an outside and uninterested party to the slow but steady decline of basic water service to East Shores' customers. Jefferson Township is deeply involved in this affair. Jefferson Township permitted the East Shores development in the first place. Jefferson Township granted building permits allowing for construction on the subdivided lots. Jefferson Township granted the permits to install septic systems which now make it impossible for individual lot owners to dig private wells. Jefferson Township permitted year round occupancy of many of those same buildings, thereby increasing demand on the water system. And Jefferson Township has for years been collecting real estate taxes levied on these same buildings and lots. These actions, along with others and some significant inaction add up to an affirmation by Jefferson Township that it approved and accepted the East Shores development and the personal investments made therein. For Jefferson Township to now stand idly by in the face of an obvious threat to the health, safety and welfare of all of the nearly 300 East Shores residents, amounts to an abrogation of one of its basic responsibilities to its citizens by a governmental body.
*67 The facts herein indicate that Jefferson may well be estopped from denying such an obligation. As stated in N.J. Suburban Water Co. v. Harrison, 122 N.J.L. 189 (E. & A. 1939):
It is of the essence of equitable estoppel that one is precluded from taking a position inconsistent with that previously assumed and intended to influence the conduct of another, if such repudiation "would not be responsive to the demands of justice and good conscience," in that it would effect an unjust result as regards the latter. Rothschild v. Title Guarantee and Trust Co., 204 N.Y. 458; 97 N.E. Rep. 879; 41 L.R.A. (N.S. 740). [at 194]
See also, West Jersey Title, etc., Co. v. Industrial Trust Co., 27 N.J. 144, 153 (1958); State v. United States Steel Corp., 22 N.J. 341, 358 (1956), and Demarest v. Hopper, 22 N.J.L. 599, 619 (E. & A. 1850). That the previous actions of Jefferson Township have influenced the customers of East Shores to invest in their property is obvious. Jefferson's failure to act now threatens to devalue that property. More importantly, the township inferentially assured its citizens and taxpayers that it would take all reasonable and necessary steps to protect their health, safety and welfare, as is the responsibility of a municipal government. The conduct which results in equitable estoppel can include spoken or written words, positive acts, failure to act and silence, State v. U.S. Steel Corp., supra, and Thomas v. Camden Trust Co., 59 N.J. Super. 142, 150 (Law Div. 1960), and although traditionally the principle of estoppel was not applicable to public authorities, Morris & Essex R. Co. v. Newark, 10 N.J. Eq. 352, 365-366 (Ch. 1855), and when applied it was done so to a lesser extent than to private parties, Thornton v. Ridgewood, 17 N.J. 499, 511 (1955), the strong recent trend unquestionably establishes that the principles of equitable estoppel apply to all public bodies where the interests of justice and fairness dictate such a course. Skulski v. Nolan, 68 N.J. 179, 198 (1975); Palisades Property, Inc. v. Brunetti, 44 N.J. 117, 131 (1965); Gruber v. Raritan Tp. Mayor & Tp. Comm., 39 N.J. 1, 13 (1962); Johnson *68 v. Hospital Service Plan of N.J., 25 N.J. 134, 143 (1957); Anske v. Palisades Park, 139 N.J. Super. 342, 348 (App. Div. 1976); Hill v. Eatontown Bd. of Adj., 122 N.J. Super. 156, 164 (App. Div. 1972); and M. & O. Disposal Co., etc. v. Middletown Tp., 100 N.J. Super. 558, 567 (App. Div. 1967), aff'd 52 N.J. 6 (1968).
Jefferson's argument that it lacks the authority to act because it is bound by the negative public response to two prior referenda is not persuasive. The defeat of a prior ordinance by referendum does not preclude a municipality from enacting thereafter a new ordinance essentially identical with that previously rejected by the voters. Cornell v. Watchung Mayor and Council, 49 N.J. 235 (1967). Nor is Jefferson's position advanced by reliance on N.J.S.A. 40:69-4.6(a) which provides that a municipality may:
* * * operate and make use of such property and rights, and sell or furnish water ... to any other person or persons * * * provided, nothing herein contained shall require such municipality generally to supply or furnish any of such services as a matter of right to any person or persons * * *
The latter part of this section is simply a clarification of and limitation upon the former part of this section. This does not mitigate the duty of a municipality to use its police powers for the protection of the health, safety and welfare of its citizens as circumstances reasonably dictate. The grant of municipal police powers as to the supply of water set forth in N.J.S.A. 40:62-47, and the general police powers of a municipality set forth in N.J.S.A. 40:48-2, were not intended by the Legislature to be limited by the provision cited by the township in N.J.S.A. 40:69-4.6(a). The courts in Reid and Mongiello, supra, were in no way inhibited by this provision in their determination with regard to the duty of municipalities to supply water under appropriate conditions.
Thus, under the facts and circumstances of this case, I find an obligation imposed upon Jefferson Township to assure the provision of an adequate, potable water supply *69 to the residents of East Shores. Jefferson Township will submit, no later than January 15, 1978, a plan for fulfilling this obligation for consideration by this court. If no acceptable alternative shall have been presented to and approved by this court by February 1, 1978, the Township of Jefferson will be required to take over, operate and rehabilitate the East Shores water system pursuant to the applicable statutory provisions. To allow for an orderly transfer of management of the company, the previous order for termination of the receivership will be modified accordingly. An appropriate order should be submitted.